Frieda H. RABKIN, Harry Lewis, Eric Emory, Alan Emory, Nancy Emory, Howard Greenwald, Werner Klugman and Samuel Kaufman, Plaintiffs Below, Appellants,

v.

PHILIP A. HUNT CHEMICAL CORPORATION, Olin Corporation, Alfred T. Blomquist, Robert T. Zetena, John M. Henske, John R. Bonniwell, Charles J. Lause, Stephen R. Petschek and George J. Haufler, Defendants Below, Appellees.

Supreme Court of Delaware.
Submitted: June 4, 1985.
Decided: Sept. 23, 1985.

Irving Morris (argued) and Norman M. Monhait, of Morris and Rosenthal, P.A., Wilmington; Wolf, Popper, Ross, Wolf & Jones, New York City, of counsel; Garwin, Bronzaft & Gerstein, New York City, of counsel; Lowey, Dannenberg & Knapp, P.C., New York City, of counsel; Tenzer, Greenblatt, Fallon & Kaplan, New York City, of counsel, for appellants.

R. Franklin Balotti (argued) and Karen L. Johnson, Richards, Layton & Finger, Wilmington; Cravath, Swaine & Moore, New York City, of counsel, for appellees Olin Corporation and John M. Henske.

Martin P. Tully and David A. Jenkins, Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants Philip A. Hunt Chemical Corporation, Alfred T. Blomquist and Robert T. Zetena.

Michael Hanrahan, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington; Richard F. Czaja (argued), Arnold S. Jacobs and Lynne M. Fischman, of Shea & Gould, New York City, of counsel, for appellees John R. Bonniwell, Charles J. Lause, Stephen R. Petschek and George J. Haufler.

Before McNEILLY, HORSEY and MOORE, JJ.

MOORE, Justice.

These consolidated class actions were filed in the Court of Chancery on behalf of the minority stockholders of Philip A. Hunt Chemical Corporation (Hunt), challenging the merger of Hunt with its majority stockholder, Olin Corporation (Olin). For the first time since our decision in *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983), we examine the exclusivity of the appraisal remedy in a cash-out merger where questions of procedural unfairness having a reasonable bearing on substantial issues affecting the price being offered are the essential bases of the suit. The Vice Chancellor ordered these cases dismissed on the ground that absent deception *Weinberger* mandated appraisal as the only remedy available to the minority. The plaintiffs sought and were denied leave to amend their complaints. They appeal these rulings.

In our view, the holding in *Weinberger* is broader than the scope accorded it by the trial court. The plaintiffs have charged, and by their proposed amended complaints contend, that the merger does not meet the entire fairness standard required by *Weinberger*. They aver specific acts of unfair dealing constituting breaches of fiduciary duties which if true may have substantially affected the offering price. These allegations, unrelated to judgmental factors of valuation, should survive a motion to dismiss. Accordingly, the decision of the Court of Chancery is reversed, and the matter is remanded with instructions that the plaintiffs be permitted to amend their complaints.

I.

The factual background of the merger is critical to the issues before us and will be set forth in substantial detail.[1] On July 5, 1984, Hunt merged into Olin pursuant to a merger agreement that was recommended by the Hunt board of directors.[2] Hunt was

---

[1] Considerable discovery was taken by the plaintiffs before dismissal and is part of the record. The information thus obtained provides important underpinning for the more particularized allegations of the proposed amendments to the pleadings.

[2] Under Delaware law an agreement of merger or consolidation must first be approved by the

a Delaware corporation, while Olin is incorporated in Virginia. On March 1, 1983, Olin bought 63.4% of the outstanding shares of Hunt's common stock from Turner and Newall Industries, Inc. (Turner & Newall) at $25 per share pursuant to a Stock Purchase Agreement (the agreement).[3]

At Turner & Newall's insistence, the agreement also required Olin to pay $25 per share if Olin acquired the remaining Hunt stock within one year thereafter (the one year commitment). It provided:

### Subsequent Acquisitions of Common Stock

Should [Olin] or an affiliate of [Olin] acquire, through a merger, consolidation, tender offer, or similar transaction, all or substantially all of the remaining outstanding shares of common stock within one year of the closing date [March 1, 1983], [Olin] agrees that the per share consideration to be paid in any such transaction shall, in the opinion of a reputable investment banking firm, be substantially equivalent in value to at least the net purchase price per share paid pursuant to this agreement.

This representation and warranty was recited almost verbatim in the Schedule 13D Olin filed with the Securities and Exchange Commission on January 6, 1983. There, Olin also stated:

If the remaining equity interest in [Hunt] is acquired after such year, the per share consideration paid in any such transaction may be greater or less than the net purchase price per share of Common Stock pursuant to the Agreement, depending upon developments with respect to the business of [Hunt] and general economic and other conditions existing at the time of such transaction.

On March 1, 1983, concurrently with the closing of the agreement, the two Hunt

directors affiliated with Turner & Newall resigned. They were replaced by John M. Henske, chairman of the board and chief executive officer of Olin, and Ray R. Irani, then president and chief operating officer of Olin. In June 1983, Dr. Irani resigned as a director of both Olin and Hunt. At that time the Hunt board was expanded to nine members, and the resulting vacancies were filled by Richard R. Berry and John W. Johnstone, Jr., executive vice presidents and directors of Olin.

When Olin acquired its 63.4% interest in Hunt, Olin stated in a press release that while it was "considering the acquisition of the remaining public shares of Hunt, it [had] no present intention to do so." Apparently, there were no discussions or negotiations between the boards of Hunt and Olin regarding any purchase of Hunt stock during the one year commitment period.

However, it is clear that Olin always anticipated owning 100% of Hunt. Several Olin interoffice memoranda referred to the eventual merger of the two companies. One document dated September 16, 1983 sent by Peter A. Danna to Johnstone, then a director of both Olin and Hunt, spoke of Olin's long-term strategy which would be relevant "when the rest of Hunt is acquired." Another communication from R.N. Clark to Johnstone and Berry concluded as follows:

In any event, *until Hunt is all Olin* and we are in the position to have their leadership participate in a centralization decision, any activity to bring Hunt to a new central location must be in abeyance. (Emphasis added.)

Finally, on September 19, 1983, Thomas Berardino, then an Olin staff vice-president in Planning and Corporate Development, sent a confidential memorandum to four of the Olin directors, three of whom, Berry, Henske and Johnstone, were also Hunt directors. That document catalogued the

---

board of the merging Delaware company before it is submitted to the stockholders. See 8 *Del.C.* §§ 251(b), (c) and 252(c).

3. Olin subsequently acquired more of Hunt's common stock on the open market, bringing its total ownership to approximately 64%.

"pros and cons of doing a backend of Hunt acquisition this year." Nine "pros" were listed for acquiring Hunt stock prior to March 1, 1984. On the "con" side the following three considerations were detailed:

—Immediate control will cost approximately $7.3M more in purchase payments than waiting until mid-1984 (e.g. $25 vs 21½ share) [4]

—Can recoup $1.2—$1.4M (after tax) of this amount within 12 months through savings noted above

—Since Hunt's performance is currently not covering Olin's goodwill and borrowing costs, additional ownership will increase the dilution of Olin's reported earnings from the current projected 3¢ to 5¢/share.

—Potential negative reaction of Hunt personnel

—Will be risk whenever Olin buys backend

The Court of Chancery found that it was "apparent that, from the outset, Olin anticipated that it would eventually acquire the minority interest in Hunt." *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Ch., 480 A.2d 655, 657–58 (1984). This observation is consistent with the Olin board's authorization, a week before the one year commitment period expired, for its Finance Committee to acquire the rest of Hunt should the Committee conclude on the advice of management that such an acquisition would be appropriate.

On Friday, March 23, 1984, the senior management of Olin met with a representative of the investment banking firm of Morgan, Lewis, Githens & Ahn, Inc. (Morgan Lewis) to discuss the possible acquisition and valuation of the Hunt minority stock. Olin proposed to pay $20 per share and asked Morgan Lewis to render a fairness opinion on that price. Four days later, on Tuesday, March 27, Morgan Lewis delivered its opinion to Olin that $20 per share was fair to the minority. That opinion also contained the following statement:

We have conducted such investigations as we deemed appropriate including, but not limited to, a review of current financial statements, projections, business activities of Hunt (which information has been supplied to us by Olin) as well as comparative information on other companies. We have not had an appraisal of the assets of Hunt made in connection with our evaluation. We have also regularly monitored the activity of the Hunt stock on the New York Stock Exchange during 1983 and to date. However, we have not met directly with the management of Hunt because of the requirement that Olin maintain total confidentiality prior to you making this merger proposal.

In reaching its conclusion Morgan Lewis evidently gave no consideration to Olin's obligation, including the bases thereof, to pay $25 per share if the stock had been acquired prior to March 1, 1984.

The same day, March 27, 1984, Olin's management presented the Morgan Lewis fairness opinion to the Olin Finance Committee with the recommendation that the remaining Hunt stock be acquired for $20 per share. At that meeting it was stated that management had determined the price based on the following factors: the Morgan Lewis analysis, Hunt's net worth, Hunt's earnings history, including current prospects for 1984, Hunt's failures to achieve the earnings projections set forth in its business plans, and the current and historical market value of Hunt stock from 1982 to 1983. The Finance Committee unanimously voted to acquire the remaining Hunt stock for $20 per share. Later that same evening Henske, Olin's chief executive officer, called Hunt President Alfred Blomquist to inform him that the Finance Committee, acting for Olin's board, had approved Olin's acquisition of the Hunt minority. The following morning, March 28, Olin and Hunt issued a joint press release announcing the cash-out merger.

**4.** We cannot tell from the record before us how the $21.50 figure was determined.

Later that day the Hunt Board appointed a Special Committee, consisting of the four Hunt outside directors, to review and determine the fairness of Olin's merger proposal. These directors met on April 4, 1984, and retained Merrill Lynch as their financial advisor and the law firm of Shea and Gould as legal counsel. This committee met again on three other occasions. At the May 10, 1984 meeting the Special Committee heard a presentation by the lawyers for several plaintiffs who had filed class actions on behalf of the minority shareholders to enjoin the proposed merger. A representative of Merrill Lynch advised the meeting that $20 per share was fair to the minority from a financial standpoint, but that the range of values for the common stock was probably $19 to $25 per share.

The outside directors subsequently notified the Hunt board that they had unanimously found $20 per share to be fair but not generous. They therefore recommended that Olin consider increasing the price above $20. The next day, May 11, 1984, Olin informed the Hunt Special Committee that it had considered its recommendation but declined to raise the price. The Hunt outside directors then met again on May 14, 1984, by teleconference call, and at a meeting of the Hunt board on May 15, also held by teleconference, the Special Committee announced that it had unanimously found the $20 per share price fair and recommended approval of the merger.

On June 7, 1984, Hunt issued its proxy statement favoring the merger. That document also made clear Olin's intention to vote its 64% of the Hunt shares in favor of the proposal, thereby guaranteeing its passage. There was no requirement of approval by a majority of the minority stockholders.

The proxy statement also described in substantial detail most of the facts related above. Specifically, it disclosed the existence of the one year commitment, the Mer-

rill Lynch conclusion that a fair range for the Hunt common stock was between $19 and $25, and the pendency of these class actions opposing the merger.

## II.

Taken together, the plaintiffs' complaints challenge the proposed Olin-Hunt merger on the grounds that the price offered was grossly inadequate because Olin unfairly manipulated the timing of the merger to avoid the one year commitment, and that specific language in Olin's Schedule 13D, filed when it purchased the Hunt stock, constituted a price commitment by which Olin failed to abide, contrary to its fiduciary obligations.[5]

The Vice Chancellor granted the defendants' motion to dismiss on the ground that the plaintiffs' complaints failed to state claims upon which relief could be granted. The court's rationale was that absent claims of fraud or deception a minority stockholder's rights in a cash-out merger were limited to an appraisal. *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Ch., 480 A.2d 655, 660–62 (1984). The Court of Chancery also denied the plaintiffs leave to amend their complaints because no new legal theories would be alleged, but only more factual detail added to the existing claims which the trial judge already considered insupportable. *Id.* at 662.

## A.

The issue we address is whether the trial court erred, as a matter of law, in dismissing these claims on the ground that absent deception the plaintiffs' sole remedy under *Weinberger* is an appraisal. The plaintiffs' position is that in cases of procedural unfairness the standard of entire fairness entitles them to relief that is broader than an appraisal. Indeed, the thrust of plaintiffs' contentions is that they eschew an appraisal, since they consider Olin's manipulative

---

5. For a more complete description of the complaints filed see *Rabkin v. Philip A. Hunt Chemi-* *cal Corp.*, Del.Ch., 480 A.2d 655 (1984).

conduct a breach of its fiduciary duty to pay the $25 per share guaranteed by the one year commitment. Furthermore, plaintiffs contend that an appraisal is inadequate here because: (1) the alleged wrongdoers are not parties to an appraisal proceeding, and thus are not personally accountable for their actions; (2) if such misconduct is proven, then the corporation should not have to bear the financial burden which only falls upon it in an appraisal award; and (3) overreaching and unfair dealing are not addressed by an appraisal.

The defendants answer that the plaintiffs' claims were primarily directed to the issue of fair value, and that under *Weinberger,* appraisal is the only available remedy.

### B.

█ On a motion to dismiss for failure to state a claim it must appear with a reasonable certainty that a plaintiff would not be entitled to the relief sought under any set of facts which could be proven to support the action. *Harman v. Masoneilan International, Inc.,* Del.Supr., 442 A.2d 487, 502 (1982). A complaint need only give general notice of the claim asserted and will not be dismissed unless it is clearly without merit, either as a matter of law or fact. *Michelson v. Duncan,* Del.Supr., 407 A.2d 211, 217 (1979); *Delaware State Troopers Lodge, etc. v. O'Rourke,* Del.Ch., 403 A.2d 1109, 1110 (1979).

█ In ordering the complaints dismissed the Vice Chancellor reasoned that:

> Where, ... there are no allegations of non-disclosures or misrepresentations, *Weinberger* mandates that plaintiffs' entire fairness claims be determined in an appraisal proceeding.
>
> *Rabkin,* 480 A.2d at 660.

*Id.* We consider that an erroneous interpretation of *Weinberger,* because it fails to take account of the entire context of the holding.

The Court of Chancery seems to have limited its focus to our statement in *Weinberger* that:

> [T]he provisions of 8 *Del.C.* § 262, as herein construed, respecting the scope of an appraisal and the means for perfecting the same, shall govern the financial remedy available to minority shareholders in a cash-out merger. Thus, we return to the well established principles of *Stauffer v. Standard Brands, Inc.,* Del. Supr., 187 A.2d 78 (1962) and *David J. Greene & Co. v. Schenley Industries, Inc.,* Del.Ch., 281 A.2d 30 (1971), mandating a stockholder's recourse to the basic remedy of an appraisal.

*Weinberger,* 457 A.2d at 715.

However, *Weinberger* makes clear that appraisal is not necessarily a stockholder's sole remedy. We specifically noted that:

> [W]hile a plaintiff's monetary remedy ordinarily should be confined to the more liberalized appraisal proceeding herein established, we do not intend any limitation on the historic powers of the Chancellor to grant such other relief as the facts of a particular case may dictate. The appraisal remedy we approve may not be adequate in certain cases, particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved. *Cole v. National Cash Credit Association,* Del.Ch., 156 A. 183, 187 (1931).

*Id.* at 714.

Thus, the trial court's narrow interpretation of *Weinberger* would render meaningless our extensive discussion of fair dealing found in that opinion. In *Weinberger* we defined fair dealing as embracing "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." 457 A.2d at 711. While this duty of fairness certainly incorporates the principle that a cash-out merger must be free of fraud or misrepresentation, *Weinberger's* mandate of fair dealing

does not turn solely on issues of deception. We particularly noted broader concerns respecting the matter of procedural fairness. *Weinberger*, 457 A.2d at 711, 714. Thus, while "in a non-fraudulent transaction ... price *may* be the preponderant consideration," *id.* at 711 (emphasis added), it is not necessarily so.[6]

Although the Vice Chancellor correctly understood *Weinberger* as limiting collateral attacks on cash-out mergers, her analysis narrowed the procedural protections which we still intended *Weinberger* to guarantee. Here, plaintiffs are not arguing questions of valuation which are the traditional subjects of an appraisal. Rather, they seek to enforce a contractual right to receive $25 per share, which they claim was unfairly destroyed by Olin's manipulative conduct.

 While a plaintiff's mere allegation of "unfair dealing", without more, cannot survive a motion to dismiss, averments containing "specific acts of fraud, misrepresentation, or other items of misconduct" must be carefully examined in accord with our views expressed both here and in *Weinberger.* See 457 A.2d at 703, 711, 714.

### III.

#### A.

Having outlined the facts and applicable principles, we turn to the details of the Hunt-Olin merger and the plaintiffs' complaints to determine whether the specific acts of misconduct alleged are sufficient to withstand a motion to dismiss.

The Court of Chancery stated that "[t]he gravamen of all the complaints appears to be that the cash-out price is unfair." *Rabkin*, 480 A.2d at 658. However, this conclusion, which seems to be more directed to issues of valuation, is neither supported by the pleadings themselves nor the extensive discussion of unfair dealing found in the trial court's opinion. There is no challenge

to any method of valuation or to the components of value upon which Olin's $20 price was based. The plaintiffs want the $25 per share guaranteed by the one year commitment, which they claim was unfairly denied them by Olin's manipulations.

According to the Vice Chancellor's analysis, the plaintiffs' complaints alleged three claims—"breach of the fiduciary duty of entire fairness, breach of fiduciary duty under *Schnell v. Chris-Craft Industries*, Del.Supr., 285 A.2d 437 (1971) and promissory estoppel." *Id.* at 659. The entire fairness claim was rejected on the ground that the plaintiffs' exclusive remedy was an appraisal. *Id.* at 660. The *Schnell* analogy was repudiated on the theory that Olin had not impinged on any rights of the minority shareholders by letting the one-year commitment expire before consummating the merger. *Id.* at 661. The court also rejected what it categorized as the promissory estoppel claim on the grounds that the language allegedly forming the promise was too vague to constitute such an undertaking, and that estoppel cannot be predicated upon a promise to do that which the promisor is already obliged to do. *Id.*

#### B.

In *Weinberger* we observed that the timing, structure, negotiation and disclosure of a cash-out merger all had a bearing on the issue of procedural fairness. 457 A.2d at 711. The plaintiffs contend *inter alia* that Olin breached its fiduciary duty of fair dealing by purposely timing the merger, and thereby unfairly manipulating it, to avoid the one year commitment. In support of that contention plaintiffs have averred specific facts indicating that Olin knew it would eventually acquire Hunt, but delayed doing so to avoid paying $25 per share. Significantly, the trial court's opinion seems to accept that point:

**6.** For a thoughtful analysis of this issue of when stockholders have standing to sue after *Weinberger,* see Weiss, *Balancing Interests in Cash-*

*Out Mergers: The Promise of Weinberger v. UOP, Inc.,* 8 Del.J.Corp.L. 1, 54–56 (1983).

It is apparent that, from the outset, Olin anticipated that it would eventually acquire the minority interest in Hunt. Olin's chief executive officer expected as much when the Agreement was executed and, in evaluating the Agreement, Olin prepared computations based upon the assumption that it would acquire 100% of Hunt.

*Rabkin,* 480 A.2d at 657–58.

 Consistent with this observation are the confidential Berardino memo to the three Olin and Hunt directors, Henske, Johnstone and Berry, about the disadvantages of paying a higher price during the one year commitment; the deposition testimony of Olin's chief executive officer, Mr. Henske, that the one year commitment "meant nothing"; and what could be considered a quick surrender by the Special Committee of Hunt directors in the face of Olin's proposal to squeeze out the minority at $20 per share.[7] While we do not pass on the merits of such questions, Olin's alleged attitude toward the minority, at least as it appears on the face of the complaints and their proposed amendments, coupled with the apparent absence of any meaningful negotiations as to price, all have an air reminiscent of the dealings between Signal and UOP in *Weinberger.* See 457 A.2d at 711. Certainly the Berardino memorandum, although not unusual as an Olin planning document, raises unanswered questions about the recognition by three of its recipients, all Hunt directors, of their undiminished duty of loyalty to Hunt. See *Rosenblatt v. Getty Oil Company,* Del. Supr., 493 A.2d 929, 938–39 (1985). As we said in *Weinberger:*

There is no "safe harbor" for such divided loyalties in Delaware. When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain. *Gottlieb v. Heyden Chemical Corp.,* Del.Supr., 91 A.2d 57, 57–58 (1952). The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts. *Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107, 110 (1952); *Bastian v. Bourns, Inc.,* Del.Ch., 256 A.2d 680, 681 (1969), *aff'd,* Del.Supr., 278 A.2d 467 (1970); *David J. Greene & Co. v. Dunhill International Inc.,* Del.Ch., 249 A.2d 427, 431 (1968).

There is no dilution of this obligation where one holds dual or multiple directorships, as in a parent-subsidiary context. *Levien v. Sinclair Oil Corp.,* Del. Ch., 261 A.2d 911, 915 (1969). Thus, individuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations, ...

*Id.* 457 A.2d at 710. These are issues which an appraisal cannot address, and at this juncture are matters that cannot be resolved by a motion to dismiss.

 In our opinion the facts alleged by the plaintiffs regarding Olin's avoidance of the one year commitment support a claim of unfair dealing sufficient to defeat dismissal at this stage of the proceedings. The defendants answer that they had no

---

**7.** As we noted in *Weinberger,* the use of an independent negotiating committee of outside directors may have significant advantages to the majority stockholder in defending suits of this type. See 457 A.2d at 709–711; 709 n. 7. The efficacy of that procedure was recently indicated by our opinion in *Rosenblatt v. Getty Oil Company,* Del.Supr., 493 A.2d 929, 937–939 (1985). However, we recognize that there can be serious practical problems in the use of such a committee as even *Rosenblatt* demonstrated.

See 493 A.2d at 933–936; Herzel & Colling, *Establishing Procedural Fairness in Squeeze-Out Mergers After Weinberger v. UOP,* 39 Business Law. 1525, 1534–37 (1984); Weiss, *Balancing Interests in Cash-Out Mergers: The Promise of Weinberger v. UOP, Inc.,* 8 Del.J.Corp. Law 1, 50–53 (1983). Thus, we do not announce any rule, even in the context of a motion to dismiss, that the absence of such a bargaining structure will preclude dismissal in cases bottomed on claims of unfair dealing.

legal obligation to effect the cash-out merger during the one year period. While that may be so, the principle announced in *Schnell v. Chris-Craft Industries* [8] establishes that inequitable conduct will not be protected merely because it is legal. 285 A.2d at 439. *See also, Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (1985); *Giuricich v. Emtrol Corp.*, Del. Supr., 449 A.2d 232, 239 (1982); *Lynch v. Vickers Energy Corp.*, Del.Ch., 351 A.2d 570, 575 (1976); *Petty v. Penntech Papers, Inc.*, Del.Ch., 347 A.2d 140, 143 (1975). At the very least the facts alleged import a form of overreaching, and in the context of entire fairness they deserve more considered analysis than can be accorded them on a motion to dismiss.

Similarly, the plaintiffs' pleas arising from the language in Olin's Schedule 13D (referred to by the trial court as the claim for promissory estoppel) should not have been dismissed on the ground that appraisal was the only remedy available to the plaintiffs challenging the entire fairness of the merger.[9]

## IV.

In conclusion we find that the trial court erred in dismissing the plaintiffs' actions for failure to state a claim upon which relief could be granted.[10] As we read the complaints and the proposed amendments, they assert a conscious intent by Olin, as the majority shareholder of Hunt, to deprive the Hunt minority of the same bargain that Olin made with Hunt's former majority shareholder, Turner and Newall. But for Olin's allegedly unfair manipulation, the plaintiffs contend, this bargain also was due them. In short, the defendants are charged with bad faith which goes beyond issues of "mere inadequacy of price." *Cole v. National Cash Credit Association*, Del.Ch., 156 A. 183, 187–88 (1931). In *Weinberger* we specifically relied upon this aspect of *Cole* in acknowledging the imperfections of an appraisal where circumstances of this sort are present. See 457 A.2d at 714.

Necessarily, this will require the Court of Chancery to closely focus upon *Weinberger's* mandate of entire fairness based on a careful analysis of both the fair price and fair dealing aspects of a transaction. See 457 A.2d at 711, 714. We recognize that this can present certain practical problems, since stockholders may invariably claim that the price being offered is the result of unfair dealings. However, we think that plaintiffs will be tempered in this approach by the prospect that an ultimate judgment in defendants' favor may have cost plaintiffs their unperfected appraisal rights. Moreover, our courts are not without a degree of sophistication in such matters. A balance must be struck between sustaining complaints averring faithless acts, which taken as true would constitute breaches of fiduciary duties that are reasonably related to and have a substantial impact upon the price offered, and properly dismissing those allegations questioning

---

**8.** The trial court's narrow interpretation of this principle misconceives the thrust of *Schnell*. *See Rabkin,* 480 A.2d at 661.

**9.** Again, we emphasize that we are not reaching the merits of the plaintiffs' claims. Our holding today is to make clear the scope of *Weinberger* when the Court of Chancery addresses a motion to dismiss a minority stockholder's suit attacking a cash-out merger. However, it is important to bear in mind that *Weinberger* was a case decided after trial on the merits. Here we address those issues solely in a pre-trial context. We neither express nor imply any views as to the outcome of these matters after they have had a fuller exploration at a later stage of the proceedings.

**10.** The defendants advanced other grounds for dismissal which were not addressed by the trial court. On appeal, the defendants Olin and John Henske again argue that the Court of Chancery lacked jurisdiction over them. We leave that issue for determination on remand. Further, on appeal, a separate brief was filed by the members of the independent committee of the Hunt board which had reviewed and recommended the $20 per share merger price. These directors contend that the complaints fail to allege any wrongdoing on their part. On remand, the Court of Chancery will have an opportunity to address that matter.

judgmental factors of valuation. *Cole v. National Cash Credit Association,* 156 A. at 187–88. Otherwise, we face the anomalous result that stockholders who are eliminated without appraisal rights can bring class actions, while in other cases a squeezed-out minority is limited to an appraisal, provided there was no deception, regardless of the degree of procedural unfairness employed to take their shares. Without that balance, *Weinberger's* concern for entire fairness loses all force.

Accordingly, the decision of the Court of Chancery dismissing these consolidated class actions is REVERSED. The matter is REMANDED with directions that the plaintiffs be permitted to file their proposed amendments to the pleadings.