Lee S. WEINSTEIN, et al., Plaintiffs,

v.

Kevin J. APPELBAUM, Tavolo, Inc., Digital Chef, Inc., Our House, Inc., OHT Acquisition Corp., Defendants.

No. 01 CIV.8515CMGAY.

United States District Court,
S.D. New York.

April 2, 2002.

Arthur Morrison, Esq., Hawthorn, NY.

Mark David McPherson, Esq., Morrison & Foerster, LLP, New York, NY.

## MEMORANDUM DECISION AND ORDER DISMISSING PLAINTIFF'S COMPLAINT

McMAHON, District Judge.

Plaintiffs are former shareholders of defendant Tavolo, Inc., a privately-held company. They purchased shares of Series A and B Preferred Stock in 1998. In connection with a merger between Tavolo and defendant Our House, Inc., approved by the Tavolo Board December 8, 2000, plaintiffs' shares were cancelled, because the shares to be received in the merger were valued at a mere $8.5 million, while holders of Series C through F Preferred Stock were entitled, under the Company's certificate of incorporation, to the first $121 million in proceeds upon liquidation. Plaintiffs' shares had no value unless the company could be sold for $121 million. The Company was in fact sold for less than 10% of that amount.

Under Delaware law, plaintiffs had 120 days to exercise their appraisal rights if they dissented from the merger. They did not do so.

Last year, plaintiffs commenced an action in this Court, before the Hon. George Daniels, alleging various claims arising out of the Tavolo/Our House merger. (*See* Docket Entry 01 Civ. 0832.) They amended their complaint, then voluntarily discontinued their action on August 23, 2001, after a period of discovery. Less than one month later, plaintiffs filed the complaint in this action. Defendants moved to dismiss the complaint with prejudice. Plaintiffs opposed the motion. While the motion was *sub judice*, they filed an amended complaint—the second in this action, but the fourth overall. After a telephone conference with counsel, in which plaintiffs' attorney represented that the amended complaint sought only to cure alleged deficiencies in pleading fraud with particularity, but did not alter or add to the underlying claims, the Court announced its intention to rule on the pending motion forthwith.

For the following reasons, the motion is granted, and the Complaint is dismissed without leave to replead.

## The Complaint

Plaintiffs' complaint, and even their amended complaint, are poorly drafted. Nonetheless, I will try to parse the allegations, construing them most favorably to plaintiffs (as I must).

The Complaint alleges that plaintiffs are holders of Series A and B preferred stock of defendant Digital Chef, which at some unspecified point changed its name to Tavolo. Plaintiffs allegedly invested $3 million into Digital Chef/Tavolo (hereinafter "Tavolo"). (Compl. ¶ 9).

Other groups of private equity investors and venture capitalists purchased stock in other preferred rounds, in amounts exceeding plaintiffs' $3 million investment. In 1998, the corporation issued Series C and D shares in exchange for an additional $10 million in financing. (Compl. ¶ 11). Plaintiffs alleged that, from at or about that time, Tavolo and its CEO (defendant Appelbaum) sought to eliminate their rights as shareholders and cause them to lose their investment. (Compl. ¶ 9, 12–14). According to plaintiffs, the "sole goal" of Tavolo and Appelbaum was to "alter the capital structure, amend the certificate of incorporation and by-laws to covertly transfer total control of the Board of Directors to those making the new round or rounds of $10,000,000 financing . . . in order to secretly permit a merger at any time after February, 1999 of the DCI–Tavolo corporation without voting control or financial benefit to the plaintiffs." (Compl. ¶ 19). They claim that Defendants never intended the new second round financing to be a bridge until sale to a strategic partner or until an IPO. (Compl. ¶ 20).

Plaintiffs allege that Appelbaum and the Tavolo Board (who are not named as defendants) "informed" plaintiffs that the $10 million investment was merely a bridge to a liquidating event or sale to strategic purchasers for completion of an IPO. They allege that they were misled by these statements (Compl. ¶ 16)—although they do not specify how they were misled. (At a later point in the complaint, they allege that their own investment was represented to be bridge financing pending some sort of sale to a strategic purchaser—*see* Compl. ¶¶ 35–37). They also claim to have been lulled into a false sense of security (Compl. ¶ 18) by representations made at the time they invested that Tavolo was a profitable enterprise (Compl ¶ 28), and at later (unspecified) times that Tavolo was still profitable, though they do not say what action they took or refrained from taking in reliance on their false sense of security. Plaintiffs allege that certain changes in the corporation's voting rights and capital structure were not disclosed to them in advance, though they do not allege that they would have had any right to

prevent such changes. (Compl.¶ 27) They allege that certain business decisions and strategies of Appelbaum's, including a plan to seek additional capital investment and nondisclosure of adverse financial information, "constituted a wrongful waste and spoliation of [Tavolo's] assets, and a wrongful appropriation by the digital Chef directors for their own use and benefit of the inside information they had acquired from Appelbaum." (Compl.¶ 41). Plaintiffs further allege that the defendants' nondisclosure of the "true financial health of the defendant [Tavolo] was a waste of corporate assets." (*Id.*) They also complain that they were not informed of new borrowing by defendants (Compl.¶ 45)—although they do not indicate that they could have either prevented those borrowing or withdrawn their investment because of them. Plaintiffs allege that obtaining a loan from Silicon Valley Bank constituted "another form of self-dealing" on the part of Appelbaum (Compl.¶ 45)—although they do not allege that Appelbaum had any personal financial interest in the bank or in the loan. Rather, they complain that no efforts were made to repay their investment from newly acquired funds, as they had purportedly been promised. (*Id.*)

Finally, plaintiffs allege that defendants, as part of their plan and conspiracy to keep plaintiffs "from having their investment replaced as a bridge to a liquidating event or sale to a strategic partner or complete an IPO" (Compl.¶ 47), "defendant directors" (reference not logical, since Appelbaum is the only individual named as a defendant) obtained a $1 million cash bonus that primarily benefitted Appelbaum while arranging the merger with defendant Our House. (Compl ¶ 47). Plaintiffs also claim that defendants (unspecified) made false and misleading statement to them about the impending SEC approval of an IPO (Compl.¶¶ 47, 49), all in violation of "their" fiduciary duty to plaintiffs.

Against this background, plaintiffs assert two counts. The First Count, sounding in common law fraud, contends—in language drawn directly from Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j—that defendants defrauded them between 1997 and 1999 by giving them false financial information; and by falsely telling them that the company would be the subject of an IPO, the proceeds of which would be used to buy plaintiffs out. They contend that these false statements defrauded and misled them into signing documents to dilute their shares in favor of the C and D preferred shareholders. (Compl.¶ 54) They allege that subsequent statements by Appelbaum to the effect that an IPO would have a greater chance of success if certain sales figures were reached (Compl.¶ 56); that they falsely represented that they had a firm IPO commitment and that such an offering would be made (Compl ¶ 59); and that they imparted false information about the company's profitability to the public (Compl.¶ 58). All these misrepresentations allegedly caused plaintiffs to lose their entire investment in the Our House merger. The Second Count, which is virtually incomprehensible, appears to allege a variant of the first claim, and seeks $5 million in damages resulting from the loss of plaintiffs' chance to participate in the fabulously successful IPO they were promised. (Compl.¶ 73).

Distilled to its essence, and drawing every conceivable inference in favor of plaintiffs, the complaint alleges that plaintiffs were induced to invest in Tavolo on the representation that they would be bought out in a subsequent transaction; that, "lulled into a false sense of security" about the operations of the company, they consented to an infusion of capital from a second group of investors (identified as Donaldson–Lufkin–Jenrette, the well-known venture capital firm); that the new

investment had the effect of diluting their interest in Tavolo (which goes without saying); that someone kept assuring them that things would work out and that the company would be able to go public; that things did not work out and the company was not able to go public; and that because their interest had been diluted when the new investors came in, they were unable to prevent the Our House merger, in which they lost their entire investment.

Every single claim about an allegedly false statement is non-specific as to who made it, when, and to whom. "Defendants" as a group are alleged to have made false and misleading statements in 1998 and 1999, even though Our House (and, presumably, OHT Acquistion Corp, the acquisition vehicle formed to effectuate the merger) is not alleged to have had anything to do with the operations of Tavolo until the merger took place.

### Conclusions of Law

Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). They attach to their motion papers voluminous documents filed (and allegedly transmitted to plaintiffs) in connection with the Our House merger, and contend that the Court should deem them incorporated into the complaint because the complaint includes allegations about that transaction. Plaintiffs, responding to the motion, attach a plethora of e-mails and other alleged "misstatements" that are nowhere specifically mentioned in their complaint. I decline to consider any of these documents. The motion can be decided on the face of the pleading.

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiff. The Court is required to read a complaint generously, drawing all reasonable inferences from the complaint's allegations. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true." *Frasier v. General Electric Co.*, 930 F.2d 1004, 1007 (2d Cir.1991). The Court must deny the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Stewart v. Jackson & Nash*, 976 F.2d 86, 87 (2d Cir.1992) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

1. *Failure to Plead Fraud with Particularity Requires Dismissal of the Entire Complaint*

Both of Plaintiffs' claims for relief sound in fraud. The complaint must be dismissed because plaintiffs have failed to plead fraud with particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure.

Under prevailing standards in this Circuit, when a complaint charges fraud, "It must (1) detail the statements ... that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements ... were made, and (4) explain why the statements ... are fraudulent." *Olsen v. Pratt & Whitney Aircraft*, 136 F.3d 273, 275 (2d Cir.1998) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir.1996)). The Complaint must also allege facts that give rise to a strong inference of fraudulent intent. It can do so by (1) alleging facts to show that the defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *S.Q.K.F.C., Inc. v.*

*Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir.1996).

Plaintiffs' complaint satisfies neither the particularity nor the scienter requirement.

■ As noted above, the alleged misrepresentations are identified in vague and general terms, without identifying the speaker, the time or the location where they were made. Moreover, plaintiffs fail to explain why the statements were fraudulent. They do not plead a single fact suggesting that anyone who made any statements intended to mislead them when those statements were made. Assuming arguendo that some statements made to plaintiffs were untrue—for example, statements about the financial solvency of the company, or about Appelbaum's intent to pursue an IPO after the DLJ investment group came in—plaintiffs fail to identify why those statements were fraudulent, because they do not claim that they took any action, or failed to take any action, in reliance thereon.

Many of the vaguely alleged misrepresentations are not actionable for other reasons. Some are statements about future actions—for example, Tavolo's intent to go public in an IPO, which allegedly induced plaintiffs to agree to the dilution of their shares. There is no factually sufficient (as opposed to conclusory) allegation that this statement was untrue at the time it was made. In the absence of such an allegation, all that is alleged is a promise to do something in the future, which will not support a claim of fraud. *Champion Titanium Horseshoe, Inc., v. Wyman–Gordon Inv. Castings, Inc.*, 925 F.Supp. 188, 190 (S.D.N.Y.1996). Other statements, such as one that Tavolo was "still profitable," fall within the "mere puffery" rule. *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994); *San Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir.1996). And the barebones statement that financial information is untrue, without specifying how or why, is insufficiently specific to state a claim. *McStay v. I.C. System, Inc.*, 174 F.Supp.2d 42, 48 (S.D.N.Y.2001).

2. *To the Extent Plaintiffs Allege Wrongdoing in Connection with the Our House Merger, the Complaint Fails to State a Claim on which Relief Can Be Granted*

■ Clearly, plaintiffs are distressed that their investment turned sour, and they are understandably dissatisfied with the Tavolo Board's decision to deal with the company's financial plight by merging with Our House. However, once the merger had been approved by a majority of Tavolo's shareholder, they, like all minority shareholders in Delaware corporations, were entitled to invoke their appraisal rights and seek the fair market value of their shares in the Delaware Chancery Court. Plaintiffs do not allege that they were unaware of their appraisal rights.[1] They also do not allege that appraisal was an inadequate remedy.[2] Absent such an allegation, appraisal is the exclusive remedy available to minority shareholders who object to a merger and who seek the fair value of their shares. *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1107 (D.Del.1985); *Glassman v. Unocal Exploration Corp.*, 777 A.2d 242, 247 (Del.2001).

---

1. As is clear from the information statement filed in connection with the merger, plaintiffs could not in good faith make such an allegation. Were this a motion for summary judgment, I would have to grant judgment to defendants on any such claim.

2. Appraisal is not an inadequate remedy simply because an investor does not fare as well as he hoped to when he invested. *See generally, Weinberger v. UOP, Inc.* 457 A.2d 701 (Del.1983).

The fact that plaintiffs allege wrongdoing in connection with the merger does not change this result. In *Shapiro v. Pabst Brewing Co.,* No. 7339, 1985 WL 11578, at *4 (Del.Ch. July 30, 1985), the Court of Chancery was faced with a situation similar to the one pleaded here. A minority stockholder alleged that defendants unlawfully manipulated a tender offer battle for Pabst, improperly expending Pabst funds to favor a friendly offeror, which denied the stockholders their greatest value for their shares. In this case, plaintiffs allege that Appelbaum arranged a bonus for himself and kept information from plaintiffs about the financial condition of Tavolo in order to arrange a merger that was to his advantage (he would retain his employment) but not theirs (their shares would be cancelled). Plaintiffs in *Shapiro,* like plaintiffs here, sought a declaration that the merger was unfair, and an award of damages to compensate them for their loss.

█ The *Shapiro* defendants moved to dismiss the complaint, on the ground that appraisal was the exclusive remedy available to dissenting shareholders. The court agreed:

> To survive a motion to dismiss, the complaint must allege facts which, if true, would render the appraisal remedy inadequate. The Supreme Court, in *Weinberger,* stated only that appraisal *may* not be an adequate remedy in cases involving self-dealing or waste. It did not hold that such allegations automatically permit a stockholder to maintain an entire fairness class action. If plaintiff is able to prove that he was damaged by the alleged unfair dealing, those damages could be included in the appraisal award. Accordingly, I conclude that appraisal is an adequate remedy under the facts alleged in the complaint and that plaintiff's claims relating to the merger, therefore, must be dismissed.

*Shapiro,* 1985 WL 11578, at *4 (emphasis in original) (citations omitted). As the court held in *Rabkin, supra,* 498 A.2d at 1107, the general rule is that a minority shareholder's exclusive remedy yields only to an exception where the stockholder properly alleges "bad faith which goes beyond the issues of mere inadequacy of price." Here plaintiffs allege that, as a result of waste and mismanagement and self-dealing, they were merged out at an inadequate price. The fact that the price, to them, was zero is not a difference that makes a difference.

### 3. The Amended Complaint Does not Cure the Defects of its Predecessor, So the Complaint is Dismissed with Prejudice

█ In an implicit acknowledgment of the deficiencies of their first (or third) complaint, plaintiffs responded to defendants motion by filing an as of right, pre-answer amended complaint, making their second pleading in this action and their fourth overall. Defendants, who asked this Court to grant their motion to dismiss the complaint with prejudice, persevere in that request, despite the filing of the amended pleading. Their reply brief is addressed almost exclusively to the allegations of the amended complaint—I assume in an effort to demonstrate that its deficiencies mean I should not permit it to be filed.

Unfortunately, Rule 15 gives plaintiffs the absolute right to file one pre-answer amended complaint. I recognize that plaintiffs appear to have gotten around that requirement by discontinuing in front of Judge Daniels and trying again in front of me. However, I elect to treat plaintiffs' new complaint as an as-of-right amended complaint and Defendants' reply brief as a motion to dismiss addressed to that pleading. Plaintiffs' counsel represented to Judge Yanthis and myself that the amend-

ments to the complaint were intended only to cure alleged failures to plead fraud with particularity, so I can judge the new pleading on that basis. Plaintiffs claim that they have finally complied with Rule 9(b). They have not. Defendants' motion to dismiss is granted, and the amended complaint is dismissed.

Plaintiffs' counsel spoke truly over the telephone. The Amended Complaint changes the numbers of the paragraphs, but adds nothing of substance to the original pleading. The newly inserted matter alleges that, as a result of discovery undertaken in the original action filed before Judge Daniels, plaintiffs learned for the first time of the existence of two additional series of shares (E & F Preferred) that, taken together, ate up the entire liquidation preference upon merger; that Appelbaum "from February 1999 onward" omitted advising plaintiffs that Williams–Sonoma had offered to acquire all or substantially all of the assets of Tavolo for $350 million, and wrongfully rejected that offer; that the announcement of the $10 million in additional financing in October 1998 was false (even though the existence of this investment is the gravamen of the original complaint); that Tavolo's announcement that it had formed a multi-million dollar strategic alliance with America Online was false because it falsely overstated the value of Tavolo; and that various misrepresentations by Appelbaum (not identified as to either time or place) were false.

Additionally, plaintiffs add allegations that the 1998 Round Two (or DLJ) financing was "completely and fundamentally unfair" to the original investors; that the actions of Appelbaum and the other Tavolo directors in arranging and approving that financing are not governed by the business judgment rule; that Ace Hardward obtained the Series E & F stock in exchange for a capital infusion of $20 million; that

Appelbaum's actions in arranging for additional venture capital financing were misguided, since Tavolo was insolvent as early as 1998. These allegations do not, either individually or collectively, cure the pleading defects of the first complaint, because they still fail to allege with specificity what was said by whom, to whom, and when.

■ To the extent that plaintiffs rely on the e-mails they attached to their response to the original motion to dismiss in order to establish the requisite specificity, they run afoul of settled law that a pleading is to be read without reference to any outside material. See Citadel Mgmt., Inc. v. Telesis Trust Inc., 123 F.Supp.2d 133, 147 n. 3 (S.D.N.Y.2000); O'Brien v. Nat'l Prop. Analysts Partners, 719 F.Supp. 222, 229 (S.D.N.Y.1989). For these reasons, the amended complaint is dismissed as well.

■ Read most favorably to plaintiffs, the still-vague allegations contend that plaintiffs were induced to invest by the promise of making money, and then further induced to consent to a dilution of their rights when new investors came in by some representation that they would someday profit from an anticipated IPO—which dilution proved highly detrimental when the Our House merger was consummated. The judges of the Southern District of New York have long recognized that investor naivete about the odds of profiting from an investment will not support a claim of fraud. See e.g., Bowman v. Hartig, 334 F.Supp. 1323, 1328 (S.D.N.Y.1971). And predictions about future buyouts, assuming any were made when plaintiffs were induced to consent to subordinate their rights to those of the newer investor group, are also insufficient to support such a claim. Quite a few capital ventures formed in the late 1990s were pitched to investors with a prediction of untold millions from an IPO like the ones that were occurring on a weekly basis in the over-

heated market of those years. But no one can promise in advance that it will be possible to take a company public successfully. Plaintiffs were not the only investors who found themselves disappointed when the IPO bubble burst two years later. That does not give them a claim in fraud.

The one new allegation that catches my eye is the claim that defendants failed to accept a much more lucrative offer from Williams–Sonoma to purchase Tavolo's assets in 1999. This appears to be an effort to particularize plaintiffs' general complaint of breach of fiduciary duty in the original pleading. However, such a claim is derivative, not direct, since it alleges mismanagement, which harms the corporation as an entity. While harm to shareholders may indeed flow from mismanagement, Delaware law provides that the corporation alone has a cause of action. *Kramer v. Western Pacific Indus. Inc.*, 546 A.2d 348, 353 (Del.1988); *Cf. Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002) (to the same effect, but applying Maryland law). Because plaintiffs are no longer shareholders of the corporation, they lack standing to bring such a claim. *Harnett v. Billman*, 800 F.2d 1308, 1316 (4th Cir.1986) (former Delaware shareholder, who was frozen out in merger, lacked standing to bring derivative claim for breach of fiduciary duty).

As I have dismissed the amended complaint for failing to cure the defects of its predecessor, the question naturally arises whether I should dismiss without prejudice, so plaintiffs can at least try to replead yet again. I decline to entertain a fifth complaint on this subject. Plaintiffs have tried four times. They have yet to allege anything except that they made a bad investment, one that subsequent infusions of capital were unable to turn around, and that predictions of an IPO and fabulous riches failed to materialize. They

have not complied with the rules for pleading fraud with particularity—even when those rules were pointed out to them by the defendants—and there is no reason for me to believe that they will ever do so, given the substance of their allegations. And the fact that plaintiffs have three times retreated, regrouped and refiled in the face of motions to dismiss fairly implies that this will continue to be their strategy in the future. Indeed, they may discontinue here (which they can do as of right under Fed. R. Civ. P 41(a)(1)) and file a third action, simply in order to avoid the need for judicial permission to amend in this action. Defendants and this Court ought not have to endure this indefinitely.

Four bites at the apple are more than sufficient. *See Armstrong v. McAlpin*, 699 F.2d 79, 93–94 (2d Cir.1983); *DeJesus v. Sears Roebuck & Co., Inc.*, 87 F.3d 65, 72 (2d Cir.1996). The best evidence of plaintiffs' ability to state a claim if leave to replead is granted is the amended complaint they have already filed, and the amended complaint does not cut it. Because the amended complaint does not cure the defects of the original complaint, I decline to dismiss with leave to replead, and instead dismiss with prejudice.

Defendants have moved for Rule 11 sanctions. I am sympathetic to their clients' position. However, they have now successfully obtained dismissal of the case. The Court therefore declines to award sanctions.

The case is dismissed. The Clerk is directed to close the file.