D. Scott **CARRUTHERS,** Springhawk,LLC, and Summerhawk, LLC, Plaintiffs,

v.

David **FLAUM,** Flaum Management Company, Inc., Russell Galbut, 3D Associates, LLC, Stanley Gallant, Individually and as Assignee of ACB Pacific Reality, LLC, LJM Enterprises, LLC, as Assignee of ABC Pacific Realty, LLC, A.P. Equity, Inc., Ancestral Reclamation, LLC, Alan H. Young, individually, d/b/a Lindenbaum and Young, and as partner in Lindenbaum

and Young, Lindenbaum and Young, Charles Petri, County of Sullivan Industrial Development Agency, and Gene Barbanti, individually and d/b/a The Barbanti Group Real Estate, Defendants.

No. 03 CIV.7768(CM).

United States District Court, S.D. New York.

March 31, 2005.

Peter D. Grubea, Buffalo, NY, for Plaintiffs.

Joshua E. Kimmerling, Cuddy & Feder & Worby LLP, White Plains, NY, Gerald Orseck, Orseck Law Offices, Liberty, NY, Benjamin Ostrer, Attorney at Law, Chester, NY, Tara C. Fappiano, Ohrenstein & Brown, L.L.P., New York, NY, for Defendants.

## DECISION AND ORDER

McMAHON, District Judge.

This is a case about a misguided effort to cash in on the as-yet unrealized boomlet in casino gambling in Sullivan County.

The Unkechaug Indian Nation want to open gaming facilities at one or more sites in Sullivan County and have sought land of suitable geographic location and ancestral connection. (Cplt.¶ 25.) The tribe (about which the complaint says almost nothing) has been recognized by the State of New York, pursuant to Indian Law, Art. 10, §§ 150–53. However, the Tribe has not been federally recognized and, as far as this court knows, has never even applied for federal recognition.

Because the Unkechaugs are not a federally-recognized Indian tribe, it cannot take advantage of the provisions of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701, *et seq.* ("IGRA"), to overcome New York State's longstanding prohibition against gambling. Nonetheless, plaintiff D. Scott Carruthers, together with two other individuals named James Simermeyer and Mitchell Stanley, established two limited liability corporations—Springhawk LLC and Summerhawk LLC—for the express purpose of developing and operating high-stakes bingo and other gaming facilities on the ancestral land of the Unke-

chaugs in Sullivan County (Springhawk's domain) and on Long Island (Summerhawk's domain). Carruthers, Simermeyer and Stanley allegedly entered into oral contracts (known as "operating agreements") with each other relating to their interest in Springhawk and Summerhawk. Thereafter, the two corporations entered into contracts with the Unkechaugs relating to the development of such a high-stakes bingo operation and other gaming facilities on land purporting to be ancestral Unkechaug land (the "gaming agreements").

Carruthers here sues multiple defendants—attorneys Alan H. Young and Charles Petri and their law firm, Lindenbaum and Young; real estate agent Gene Barbanti and a firm controlled by him, AP Equity, Inc.; and a firm known as Ancestral Reclamation LLC—for tortiously interfering with his relationship with his partners Simermeyer and Stanley (who appear to have parted ways with him) pursuant to the Springhawk and Summerhawk operating agreements. (First Cause of Action). Carruthers also alleges that the other defendants—including David Flaum and Flaum Management, a Rochester developer with an interest in gaming operations; and Stanley Gallant and Russell Galbut, real estate developers from New York City—tortiously interfered with the gaming contracts between Springhawk and Summerhawk, on the one hand, and the Unkechaugs on the other.

All defendants except Gallant and his related entities have moved for judgment on the pleadings dismissing the first sixteen claims, on the ground that the underlying contracts are invalid and unenforceable. The Gallant defendants move separately for summary judgment dismissing the entire complaint as against them, on the ground that they had absolutely nothing to do with this whole situation.

The contracts with which defendants allegedly interfered fall into three categories: the "operating agreements" that govern the relations among the principals in plaintiffs Springhawk and Summerhawk; the "gaming agreements" (as plaintiffs call them) that Springhawk and Summerhawk entered into with the Unkechaug; and an "employment agreement" between Springhawk and someone named Robert Kingsley.

The gaming agreements are not valid agreements and cannot be enforced under New York law because they have as their purpose an illegal activity—gambling—and they fall within no exception to New York State's longstanding prohibition against all forms of gaming. For that reason, defendants are entitled to dismissal of plaintiff's claim for a declaration that the gaming agreements are valid (Sixteenth Cause of Action).

Moreover, one cannot tortiously interfere with an illegal and unenforceable agreement. Nor can one interfere with the so-called "employment agreement" with Kingsley, which was nothing more than an open-ended consulting agreement designed to lead to employment in the future. The Eighth through Fifteenth Causes of Action must thus be dismissed as well.

In the First Cause of Action Carruthers personally seeks relief against Ancestral, AP Equity, Petri, Young and Barbanti (the "AP Equity Defendants") for allegedly interfering with his relations with his limited liability partners. Insofar as this claim relates to the operating agreement that established Springhawk, it must be dismissed with prejudice, because the complaint specifically alleges that Springhawk was established for the patently illegal purpose of developing and operating high-stakes bingo and other gaming facilities in

Sullivan County, New York, on ancestral land of the Unkechaug Indian Nation. Nothing whatever is alleged in the complaint concerning the Summerhawk operating agreement (except that it exists), and so any claim relating thereto must be dismissed for that reason alone—and with prejudice, for reasons that will become clear below.

Finally, the Second through Seventh Causes of Action must be dismissed because the complaint does not identify what agreement or agreements to which Carruthers (the only plaintiff on those claims) was a party were the subject of any allegedly tortious interference.

Defendants David Flaum and Flaum Management Company (the "Flaum Defendants") move to dismiss the remaining claims asserted against them: the Eighteenth (for breach of contract), Twenty–First (for fraud and misrepresentation), and Twenty–Fifth (to pierce the corporate veil) causes of action. For the reasons stated below, the Flaum Defendants' motion to dismiss the non-tortious interference claims is GRANTED as to the Twenty–Fifth Causes of Action, but DENIED as to the others.

Finally, Defendants Stanley Gallant, Jack Sternklar, and LJM Enterprises LLC (the "Gallant Defendants") separately move for summary judgment to dismiss the remaining claims asserted against them. Four of these pertain to Gallant himself: the Eighteenth (for breach of contract), Twenty–First (Fraud and misrepresentation), Twenty–Fifth (to pierce the corporate veil), and Twenty–Sixth (constructive trust) causes of action. The Twenty–Seventh (unjust enrichment; resulting trust) pertains to all three Gallant Defendants. For the reasons stated below, the Gallant Defendants' motion for summary judgment to dismiss the non-tortious interference claims is GRANTED

as to the Twenty–Fifth Causes of Action, and adjourned until the completion of Rule 56(f) discovery as to all other claims.

### Standards of Review

*Motion for Judgment on the Pleadings*

The standard of review on a motion for judgment on the pleadings under Rule 12(c) is whether "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Serv., Inc. v. Int'l Union, United Plant Guard Workers of Am.,* 47 F.3d 14, 16 (2d Cir.1995). This standard is the same as that applicable to a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). *Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Lab.,* 850 F.2d 904, 909 n. 2 (2d Cir.1988). A court may grant a Rule 12(b)(6) motion to dismiss for failure to state a claim only "when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Phillip v. University of Rochester,* 316 F.3d 291, 293 (2d Cir.2003) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Kaltman–Glasel v. Dooley,* 156 F.Supp.2d 225, 226 (D.Conn. 2001).

The function of the Court is not to weigh the evidence that may be presented at trial. Instead, the Court must determine if the claims are legally sufficient. *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985); see also *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). The Court must construe all reasonable inferences in favor of the plaintiff and accept the allegations contained in the claims as true. *See Desiderio v. National Ass'n of Sec. Dealers, Inc.,* 191 F.3d 198, 202 (2d Cir.1999). Therefore, a court must evaluate whether the allegations in the complaint can sustain a cause of action under applicable law, and should grant the motion to dismiss only if the plaintiffs can prove no set of facts in

support of their claims that would entitle them to relief. *See Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002); *King v. Simpson,* 189 F.3d 284, 286 (2d Cir.1999). The issue is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims. *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995).

However, it is well settled that on a motion to dismiss, where the validity of contracts is challenged, the court may review and properly consider the terms of the contracts that were referenced in the pleadings. *See Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991). Here the defendants argue that the contracts with which they allegedly interfered are invalid and unenforceable (and thus cannot be the subject of a tortious interference claim). Therefore, it is appropriate for the court to examine those contracts. I have obtained copies of those that are reduced to writing, and a description of those that are not, from plaintiff's counsel. Obtaining these agreements does not convert the motion for a judgment on the pleadings into a motion for summary judgment.

However, because some of the agreements at issue turn out to be oral agreements, plaintiff's counsel has provided the court with a letter brief describing the pleaded contracts that were never reduced to writing. In making my determination about the validity of the employment agreement with Kingsley I have relied on that statement. Should that be deemed a conversion of this motion into one for summary judgment, I note that this is the rare instance in which no advance notice to the parties of the court's intent to convert the motion is required. Generally, a court should give the parties explicit notice of its intention to convert such a motion. *First*

*Financial Ins. Co. v. Allstate Interior Demolition Corp.,* 193 F.3d 109, 114 (2d Cir. 1999). However, in certain circumstances, explicit notice is not necessary. *Green v. Doukas,* 205 F.3d 1322, 1323 (2d Cir.2000). The "essential inquiry" is whether the parties were taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleading. *In re G & A Books, Inc.,* 770 F.2d at 294–95; *see also Metrokane, Inc. v. Wine Enthusiast,* 185 F.Supp.2d 321, 325 (S.D.N.Y.2002).

Here, the only thing extrinsic to the pleadings (and the pleaded contracts) that has been considered by the court is plaintiff's counsel's description of the alleged oral agreements. No one was taken by surprise that I considered this information; I solicited it, in order to determine defendants' challenge to the validity of the pleaded contracts. Some of the moving defendants submitted letters commenting on plaintiff's description of the contracts at issue, so defendants were not deprived of a reasonable opportunity to meet facts outside the pleadings. Additionally, Defendants have not been prejudiced by my consideration of plaintiff's presentation. Rather, they have been assisted, since plaintiff's description of the oral agreements helps to establish their invalidity.

*Motion for Summary Judgment*

Fed.R.Civ.P. 56 provides that summary judgment shall be granted where there is no "genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law," that is, where the party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thus, a party opposing summary judgment must point to "specific facts showing that there is a genuine issue for trial," by proffering

"significant probative evidence tending to support [its] complaint." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citations omitted). The non-movant "may not rest upon the mere allegations or denials of [its] pleadings," Fed.R.Civ.P. 56(e), or upon "mere speculation or conjecture as to the true nature of the facts." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). However, where there has been no opportunity for discovery, a court may either refuse the application for judgment or order a continuance. Rule 56(f).

## Background Allegations

### The Operating Agreements

According to the complaint, Springhawk is a Delaware Limited Liability Company that was established for the purpose of developing and operating high-stakes bingo and other gaming facilities in Sullivan County, New York, on ancestral land of the Unkechaug Indian Nation. The members of Springhawk at its inception were Carruthers, Simermeyer and Stanley. Summerhawk is a second Delaware Limited Liability Company founded by Carruthers, Simermeyer and Stanley.

Upon the formation of Springhawk, the three members entered into operating agreements—one for Springhawk and one for Summerhawk—which governed their relations vis a vis one another. The operating agreements that are alleged in the complaint are oral agreements, with terms that, according to a recent clarifying letter from plaintiff's counsel, are imposed by default under the Delaware Limited Liability Company Act. At all time relevant to this action (and until February 2003, well after the events in suit took place), there

was no written operating agreement for either LLC.[1] However, according to the complaint, Carruthers was to be controlling members of Springhawk, with a 56.25% ownership stake. Simermeyer and Stanley were to have 25% and 19.25% interests, respectively. (Cplt.¶¶ 18–21.)

### The Gaming Agreements

Springhawk entered into two separate written agreements with the Unkechaug Indians. (Cplt.¶ 22.) These "gaming agreements" (as plaintiffs denominate them) are appended to the motion record as court exhibits.

The first agreement, or the "A" Agreement, dated April 26, 2002, is entitled "Casino Gaming Management Agreement By and Between Unkechaug Indian Nation and Spring Hawk, LLC, for Casino Gaming Facilities at Sullivan County, New York." (Court Ex. 1) It recites that the Unkechaug are in the process of developing a full scale gaming facility at Exit 106 off Route 17 West (which is in Sullivan County) and it granted Springhawk the exclusive right to operate and manage that gaming facility for a period of ten years beginning on the day when the gaming facility first opened. (*Id.*) It also granted Springhawk a "pre-opening management term" for the period between the time the agreement was signed and the opening of the casino.

A companion, or "B" agreement, entitled "Economic Development and Management Agreement," (Court Ex. 2), purported to grant the Springhawk "similar rights" with respect to "other economic development projects" undertaken by the Unkechaugs. *Id.*; (Cplt.¶ 22). The words of the com-

---

1. According to a letter written by plaintiffs' counsel at the request of the court, dated March 16, 2005, the members of Springhawk and Summerhawk entered into written agreements, which counsel described as "amended and restated" operating agreements, in February 2003. Counsel states that these written agreements have no bearing on the claims asserted in this action, since they post-date the relevant events. I agree.

plaint suggest that this contract entitled Springhawk to operate and manage economic development projects other than gaming facilities that were undertaken by the Unkechaugs. However, when plaintiffs were forced to produce the agreement itself, it turns out that it (1) vests in Springhawk the irrevocable and exclusive right to develop and operate gaming facilities on property to be acquired by the Unkechaug in Schodack, New York (located in Rensellaer County) and (2) grants Springhawk the exclusive and irrevocable right to handle all other economic development activities at Schodack, including hotels, shopping centers, restaurants, transportation, infrastructure, waste management, communications, insurance, financial, tourism, advertising, gasoline, convenience vending and sale of tobacco products, as well as anything else the parties might agree upon at a later date. The agreement then goes on to set forth the details of the Gaming Facility to be developed at Schodack and the distribution of profits as between the Tribe and the plaintiffs—one section describing the distribution of profits from gaming and one section describing distribution of profits for non-gaming enterprises. Attached to the agreement is the first page of a document called the "Unkechaug Nation Gaming Ordinance." (The document is obviously longer than the single page transmitted to me).

Two months earlier, in February 2002, Summerhawk had entered into two virtually identical "A" and "B" agreements relating to "High Stakes Bingo and Gaming Management" on Long Island (Court Ex. 3) and "Economic Development and Management" on Long Island (Court Ex. 4). There is not a single factual allegation in the complaint before this court that addresses these agreements, or Summerhawk, or activities on Long Island. Nonetheless, plaintiff seeks relief with regard to these agreements, specifically, a declaration (in the Sixteenth Cause of Action) that these agreements are valid and enforceable.

*Purchase of Apollo Mall Plaza and 3D Industrial Park (Springhawk Gaming Contracts)*

The Unkechaug wanted to open gaming facilities at one or more sites in Sullivan County. They looked for land that they could identify as "ancestral land," believing that they could develop gaming facilities thereon "outside of state and federal control." (Cplt.¶ 25.)

In March or April of 2002, Barbanti, Petri, and Young were introduced by Simermeyer to Carruthers. They sought to convince Carruthers and the Unkechaug that they could assemble the necessary land and assist in the financing for multiple gaming contracts. (Cplt.¶ 26.)

The Unkechaug eventually decided to acquire two parcels of land in Sullivan County: the Apollo Mall Plaza and the 3D Industrial Park, both located in the Town of Thompson. (Cplt.¶¶ 27, 28.) The Unkechaug believed that they had ancestral claims to both of these properties. *Id.*

Petri, Young, and Barbanti allegedly gave verbal and/or written assurances to Carruthers and the Unkechaug that the two properties—the Apollo Mall Plaza and 3D Industrial Park—were owned and controlled by defendant Ancestral Reclamation. (Cplt.¶ 30.) Plaintiffs contend that these assurances were untrue, and that in fact the land underlying the Apollo Mall was owned by the Sullivan County Industrial Development Agency, while the ground lease on the property was owned by defendant AP Equity, a company headed by Barbanti that had recently emerged from bankruptcy. (Cplt.¶¶ 30, 37–38.)

Plaintiffs Carruthers and Springhawk agreed to advance the Tribe the money

needed to make a $550,000 initial deposit on these properties, (Cplt.¶ 29), and one or more "written memoranda of agreements" were signed by the Unkechaug (as purchaser), Springhawk (as co-developer of the two properties), and Ancestral (as seller). (Cplt.¶ 31.) Pursuant to the agreement, Ancestral was to transfer both the Apollo Mall Plaza and 3D Industrial Park to the Unkechaug, although Ancestral was aware that Carruthers and Springhawk were paying the initial deposits. (Cplt.¶ 32.)

*Mortgage on the Apollo Mall Plaza*

During the negotiations, Petri, Young, and Barbanti indicated that the Apollo Mall property was encumbered with approximately $500,000 in tax and government liens, and had a mortgage outstanding on the property in favor of the Bank of Kuwait with a balance of $3,500,000. They allegedly represented that the mortgage would be settled for a reduced amount. (Cplt.¶¶ 33, 34.) Defendant Young, a licensed New York attorney, agreed to hold the $550,000 down payment that had been advanced by Carruthers and Springhawk in escrow pending a formal settlement of the mortgage. (Cplt.¶¶ 35, 238, 240.)

Plaintiffs allege that the various representations made by Petri, Young, and Barbanti regarding this mortgage were "almost all untrue." (Cplt.¶ 36.) Specifically:

(1) Petri and/or Young and/or Barbanti allegedly represented that the $3,500,000 mortgage on the Apollo Mall would be settled for a reduced amount—approximately $1,500,000. (Cplt.¶¶ 33–35.)

(2) Petri and/or Young and/or Barbanti stated that the mortgage against the property and ground lease of Apollo Mall was owned by the Bank of Kuwait, when in fact it was owned by a company known as ABC Pacific Realty, LLC, which had taken an assignment of the mortgage in May 2001. (Cplt.¶ 39.)

*Purported Transfer of Ownership and Subsequent Events*

A purported deed for the Apollo Mall Plaza was executed and delivered to the Unkechaug on April 26, 2002, by AP Equity (signed by Barbanti and notarized by Young). (Cplt.¶ 41.) At the time the "deed" was executed and notarized, Barbanti and Young are alleged to have been aware of the true ownership status of the property—i.e, that it was not owned by Ancestral. (Cplt.¶¶ 39–41.)

On about May 3, 2002—a week after "selling" the Apollo Mall to the Unkechaug—AP Equity allegedly purchased the Apollo Mall property from the Sullivan County IDA, utilizing all or a portion of the escrowed $550,000 deposit to make the payment. (Cplt.¶ 43.)

Defendants Petri, Young, and Barbanti never resolved the Apollo Mall Plaza mortgage claim. (Cplt.¶ 43.) Instead, on or about May 15, 2002—allegedly with the assistance of Young and Petri—the mortgage against the Apollo Mall Plaza was assigned by its real owner, ABC Pacific Realty, LLC, to defendants Gallant, Sternklar, and LJM Enterprises. (Cplt.¶¶ 44, 45.) Far from compromising the mortgage for a lesser amount, Gallant, Sternklar, and LJM Enterprises "continued" the foreclosure action against the Apollo Mall Plaza property (plaintiff's choice of words suggests that ABC Pacific had already commenced a foreclosure action) and eventually purchased the property at the foreclosure sale. They now claim ownership of that property free and clear of any claim by plaintiffs or the Unkechaugs. (Cplt.¶ 46.)

According to the complaint, the 3D Industrial Park was never transferred to the Unkechaug or plaintiffs. (Cplt.¶ 47.)

*The Alleged Tortious Interference: The Operating Agreements*

From the date of his introduction to Petri, Young, and Barbanti until May 14, 2002, Carruthers was under the belief that Petri, Young, and Barbanti (as well as AP Equity and Ancestral) were interested only in the real estate development aspects and certain financing aspects of the Unkechaugs' gaming plans, not in the operation or management of the gaming facilities themselves. (Cplt.¶ 48.) However, Carruthers belatedly learned that Petri, Young, and Barbanti were engaged in other activities relating to the Unkechaug. First, he discovered that they were attempting to convince Simermeyer and Stanley to breach the operating agreements (of both Springhawk and Summerhawk) by promising them they would earn "greater fortune" if they breached their contractual obligations to Carruthers. (Cplt ¶¶ 49–50.) According to the complaint, Simermeyer and Stanley succumbed to these blandishments and breached the Springhawk operating agreement by, *inter alia,* inducing Carruthers to advance the $550,000 purchase deposit for the Sullivan County properties at a time when they had already decided to attempt to oust Carruthers as the majority member of Springhawk and Summerhawk. (Cplt.¶ 59.) This allegedly violated either unspecified terms of the operating agreement or certain implied contractual obligations of honesty, care, and loyalty. (Cplt.¶¶ 53–54.) In keeping with the complete absence of any factual allegations regarding Summerhawk or the Long Island projects, the complaint recites no specific factual allegation about how Simermeyer and Stanley allegedly violated the Summerhawk operating agreement.

The interfering actions of the AP Equity Defendants also allegedly strained the relationship between Springhawk and the Unkechaug, and "caused inexcusable delay and perhaps permanent cancellation in the opening of gaming facilities by the Unkechaug Indian Nation in Sullivan County and elsewhere." (Cplt.¶ 60.)

Carruthers anticipated earning some $450,000,000 from the work of Springhawk and Summerhawk "over the life of the gaming contracts." (Cplt.¶ 61.) He seeks damages in that amount from the AP Equity Defendants, jointly and severally, for inducing the breaches of the operating agreements by Simermeyer and Stanley (First Cause of Action).

*Alleged Tortious Interference: The Gaming Contracts*

The Eighth through Fourteenth claims assert that the various groups of defendants tortiously interfered with Springhawk's and Summerhawk's gaming contracts with the Unkechaug, as well as with the employment contract of a key employee of Springhawk's named Bob Kingsley. These claims all incorporate factual allegations that are pleaded in connection with the Second through Seventh Causes of Action.

The Eighth Cause of Action is asserted against the AP Equity Defendants as principals acting for their own benefit. It asserts that they tortiously interfered with the contracts described above. Despite the verbosity of the complaint, the actions specified therein as having constituted the tortious interference are few. The AP Equity Defendants are accused of using inducements, including offering to fund a "settlement" through which Carruthers would have given up his majority interest in Springhawk and Summerhawk, to persuade Stanley and Simermeyer to oust plaintiff from his controlling position in those corporations. (Cplt.¶¶ 137–38.) They are also accused of making material misrepresentations in connection with the

Tribe's acquisition (or non-acquisition) of the Apollo Mall and 3D Industrial Park.

Additionally, the Eighth Cause of Action specifically alleges that the AP Equity Defendants induced the Unkechaug to breach the gaming contracts with Springhawk and Summerhawk "through persuasion, offering better contractual terms, and other means (as hereinbefore described)." (Cplt.¶ 145.) The pleading does not specifically assert that the defendants entered into a competing gaming agreement with the Unkechaug—indeed, it contains the extraordinary allegation that, "the extent of the breach and the Unkechaug Indian Nation's ability to cure the breach has not yet been determined." (Cplt.¶ 149.)

Springhawk and Summerhawk seek "the value of the benefit [Springhawk/ Summerhawk] expected to receive under the gaming contracts" as damages for the alleged tortious interference with the gaming contracts and the Kingsley employment contract. (Cplt.¶¶ 147, 150–51.) Springhawk claims $250,000,000 in damages and Summerhawk claims $500,000,000. (Cplt.¶¶ 152–53.)

The Ninth through Fourteenth Causes of Action seek to attribute the actions of the AP Equity Defendants (as set forth in the Eighth Cause of Action) to the other three groups of defendants.

*The Flaum Defendants:* Flaum Management is a real estate development company in Rochester New York. Its principal is defendant David Flaum.

At some time between 1997 and 2000, defendant David Flaum allegedly began to acquire property in Sullivan County for the eventual development of gaming and related facilities. (Cplt.¶¶ 65, 66.) At the time, Flaum was acting in conjunction with the Cayuga Indian Nation (Cplt.¶ 64), Barbanti allegedly acted as Flaum's real estate broker in connection with these purchases, and Petri acted as the Flaum Defendants' agent in their dealings with local officials in Sullivan County. (Cplt.¶¶ 67–68.)

As is well known, the Cayuga are not the only tribe interested in casino development in the Catskills. According to the complaint, there came a point when Flaum came to believe that his enterprise with the Cayuga was unlikely to receive the necessary governmental approvals required to open a Catskills casino. At some point in early 2002, Flaum allegedly became aware of the Unkechaugs' plan to develop gaming facilities in Sullivan County without any federal or state approvals or control, and wanted to become involved with this development. However, because of his existing (and potentially competing) plans with the Cayuga, Flaum preferred to use intermediaries to deal with the Unkechaugs and Springhawk. The Flaum Defendants therefore allegedly authorized the AP Defendants to act as their agents to deal with the Unkechaugs and Springhawk.

The complaint alleges that "Although Petri, Young and Barbanti were also motivated by self-interest, their actions [concerning the Apollo Mall and 3D Industrial Park, as alleged above] were allegedly undertaken for the sole or primary benefit of the Flaum Defendants."[2] (Cplt.¶¶ 72–75.) In particular, plaintiffs allege that when Ancestral contracted to transfer the Apollo Mall Plaza and 3D Industrial Park to the Unkechaugs, the Flaum Defendants were secretly the controlling shareholders, directors, officers and/or managers of AP Equity (Cplt.¶ 76), and that Ancestral's

---

2. Plaintiffs do not explain how dealings motivated by self-interest can be undertaken *solely* for the benefit of someone else, but if I quibbled with the many illogical statements and non-sequiturs in the complaint I could never finish this opinion.

commitments under the agreements with Springhawk and the Unkechaugs "could not have been accomplished without the approval and active participation of Flaum and Flaum Management." (Cplt.¶ 78.) Since the only such commitments pleaded in the complaint are the commitments to transfer the two properties to the Unkechaugs, as a matter of logic, these transfers would have to be the "commitments" referred to by plaintiffs at Paragraph 78 of the complaint.

*The Gallant Defendants:* Stanley Gallant is alleged to be a purchaser and developer of distressed real estate in the New York City area. Gallant allegedly learned of the pending foreclosure against the Apollo Mall Plaza and the Unkechaugs' interest in acquiring the property for their gaming facility. Upon learning of this, and purportedly desiring to develop the Mall into a gaming facility with the Unkechaugs, Gallant allegedly arranged to purchase the mortgage from ABC Pacific Realty, and reached an understanding with Flaum that gave him control over the development of the Apollo Mall Plaza property.

*The Galbut Defendants:* The discussion of the unacquired 3D Industrial Park property introduces a new character— Russell Galbut—yet another real estate developer who purportedly wanted to muscle out Carruthers and do a deal with the Unkechaugs himself. "Upon information and belief," plaintiff alleges that Galbut reached an understanding with Flaum and

Gallant that gave Galbut control over the development of 3D Industrial Park—the other parcel the Unkechaugs were supposed to acquire—as well as the development of 1,800 acres elsewhere in New York[3] that the Unkechaugs never contracted to acquire. At some point in March 2002, Galbut allegedly authorized the AP Equity Defendants to "take the steps hereinbefore described" in order to rupture the relationship between Carruthers and his partners. Insofar as their actions involved the 3D Industrial Park and the other parcel, the AP Defendants were allegedly motivated solely or primarily for the benefit of Galbut and his company, 3D Associates.[4]

A claim more or less identical to the Eighth Cause of Action is asserted, in purely conclusory fashion, against the Flaum Defendants (Ninth Cause of Action) the Gallant Defendants (Eleventh Cause of Action) and the Galbut Defendants (Thirteenth Cause of Action). Specifically, plaintiffs allege that the Flaum defendants, Gallant, Galbut and 3D Associates authorized the AP Equity Defendants, acting as their respective agents, to sell land to the Unkechaug and Springhawk with the intention of interfering with the Springhawk and Summerhawk operating agreements (Cplt. ¶¶ 71, 73, 76, 77)—I presume by thereafter taking the land, via the mortgage foreclosure route, and thus angering the Unkechaug, who may have fired the Carruthers-controlled corporations soon

---

3. There is no allegation in the complaint that Springhawk and Summerhawk ever had any interest in this property. I do not know why there is any reference to it in the complaint, and I strike all reference to the 1800 acres Mamakating property as surplusage.

4. The complaint does not explain what actions the AP Equity Defendants may have

undertaken "solely or primarily" on behalf of the Flaum Defendants; the actions they allegedly took with regard to the Apollo Mall were performed "solely or primarily" for Gallant and the actions taken in connection with the other properties mentioned in the complaint were performed "solely or primarily" for Galbut.

after.[5] Springhawk and Summerhawk further allege that the Flaum, Gallant and Galbut Defendants authorized the AP Equity Defendants, acting as their agents, to interfere with the gaming contracts by: (1) convincing Simermeyer and Stanley to breach their operating agreements with Carruthers (Cplt.¶ 137); (2) assisting Simermeyer and Stanley in their (apparently unsuccessful) efforts to oust Carruthers and assume control of Springhawk and Summerhawk (Cplt.¶ 139); and (3) making efforts to induce the Unkechaugs to ignore gaming contracts with Springhawk and Summerhawk and enter new contracts with Ancestral (Cplt.¶ 143).

*Alleged Tortious Interference with Employment Contract*

The AP Equity Defendants also allegedly induced a key Springhawk employee named Bob Kingsley to breach his "employment agreement" with Springhawk and to assist them in operating gaming facilities under new agreements with the Unkechaug. The alleged employment agreement is not attached to the complaint, but like all the other agreements, its validity is specifically challenged by the motions for judgment on the pleadings. In response to a request for a copy of the agreement, plaintiffs' counsel represented that Kingsley did not have a written employment contract; that he was hired as a "paid consultant" to advise and manage all aspects of casino development, as well as certain non-gaming aspects of the proposed project (setting up restaurants and non-gaming concessions). Plaintiff's counsel represents that Kingsley was paid as a consultant (not an employee) at the rate of $15,000—$20,000 per month. Counsel further represents, "The oral agreement with Mr. Kingsley was open-ended, and the parties contemplated it would be a permanent arrangement, though the contractual relationship would presumably have been terminable at will by either party." (Letter of March 16, 2005, at 2). None of this, of course, is set forth in the complaint; indeed, much of it contradicts what is sketchily pleaded in the complaint.

The three other groups of defendants are alleged to have induced Kingsley to breach his employment agreement through the actions of the AP Equity Defendants. (Cplt.¶¶ 144, 146.)

Springhawk does not assert any claim for additional damages as a result of the alleged interference with Kingsley's contract. It seeks only the estimated value of what plaintiffs contend they would have received if the terms of the gaming agreements had been carried out and the gambling and related facilities developed.

*Some Speculation*

I gather that what may have happened here is that the Unkechaug may have repudiated their contracts with Springhawk and Summerhawk (which are apparently still controlled by Carruthers, or he would not be able to maintain a lawsuit on their behalf). They may have entered contracts with the AP Equity Defendants, who may or may not be acting as a front for the other three defendant groups as well as for themselves. Kingsley, who once served as a consultant for Springhawk and Summerhawk, may no longer be working with Carruthers and his partners and may be working hand in glove with the defen-

---

5. Again, I am surmising, in an effort to figure out exactly what is being alleged here. The complaint says nothing about what the Unkechaug did or did not do vis a vis the gaming contracts—apparently because, as noted above, the extent of the Tribe's breach "cannot presently be determined." Frankly, I do not think Carruthers knows whether the Unkechaug have entered into a competing contract with any of the named defendants or not. To that extent, this lawsuit can best be characterized as a fishing expedition.

dants and the Unkechaug. The same may or may not be true of Simermeyer and /or Stanley. It is hard to say. Plaintiff's pleading is deliberately obtuse about these and other matters. Fortunately, the only thing I need to deal with here is the validity of the agreements that are the subject of the tortious interference claims, and that has nothing to do with any of the above.

## Procedural History

Plaintiffs sued the various listed defendants in Sullivan County Supreme Court. There being complete diversity, the action was removed by defendants on October 2, 2003, pursuant to 28 U.S.C. § 1332(a). Plaintiffs have voluntarily discontinued their claims against defendant Sullivan County Industrial Development Agency.

The AP Equity, Flaum and Galbut Defendants have answered and moved for judgment on the pleadings. Plaintiffs oppose the motion.

The Gallant Defendants, who did not originally make a dispositive motion, recently moved for summary judgment dismissing them from the case, on the ground that they had nothing to do with any of this except to take an assignment of a mortgage as part of a workout of other deals. Plaintiffs, in a letter from counsel dated March 16, 2005, state that they do not presently intend to contest the Gallant motion, but ask to be allowed to take discovery pursuant to Fed.R.Civ.P. 56(f) concerning the Gallant Defendants' involvement. The letter sets out plaintiffs' purported good faith basis for suing the Gallant Defendants. Counsel asserts that plaintiffs will discontinue the action against the Gallant Defendants if that discovery shows no involvement on their part in the matters pleaded in the complaint.

## Discussion

### I. *Tortious Interference Claims*

Under New York law, the elements of a tortious interference with contract claim are: "(a) that a valid contract exists; (b) that a third·party had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996) (citing *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 134 N.E.2d 97, 99–100, 151 N.Y.S.2d 1, 5 (1956); *Kaminski v. United Parcel Serv.*, 120 A.D.2d 409, 412, 501 N.Y.S.2d 871, 873 (1st Dep't 1986)).

In the first Fifteen Causes of Action, Carruthers, Springhawk, and Summerhawk seek relief against various groups of defendants for interfering with various contracts—the operating agreements, the gaming agreements and the employment agreement. The threshold issue raised by defendants' motions for judgment on the pleadings/summary judgment as to each of these claims is whether the contract that is allegedly interfered with is a valid and enforceable contract. If the contract upon which recovery is sought is premised on an illegal purpose, than the contract is void, and it cannot be the subject of a claim for tortious interference. *See e.g.*, *Harris v. Economic Opportunity Com'n of Nassau County, Inc.*, 171 A.D.2d 223, 230, 575 N.Y.S.2d 672 (2d Dep't 1991); *Nielsen v. Donnelly*, 110 Misc. 266, 268, 181 N.Y.S. 509 (Mun. Ct. Manhattan 1920); *see also Hartman v. Harris*, 810 F.Supp. 82 (S.D.N.Y.1992) ("It is well settled under New York law that a contract to perform an illegal act is void and unenforceable.") (citing *Riggs v. Palmer*, 115 N.Y. 506, 511–12, 22 N.E. 188 (1889)).

The contracts that were allegedly tortiously interfered with were (1) the operating agreements among Carruthers, Simermeyer and Stanley (First Cause of Action); (2) the gaming contracts between Springhawk, Summerhawk and the Unkechaug (Eighth through Fourteenth Causes of Action); and (3) the employment contract between Kingsley and Springhawk (Eighth through Fourteenth Causes of Action).

Defendants contend that all of the contracts at issue here are void because all are predicated on the Unkechaugs' ability to maintain gaming facilities on their "ancestral lands." They do not make this argument particularly effectively, so I will try to make it for them:

1. The gaming agreements are void because they give Springhawk and Summerhawk the exclusive right to operate and manage any gaming facilities opened by the Unkechaug Indian Nation in Sullivan County and on Long Island.

2. The operating agreements are void because they contemplate that those corporations will be formed to engage in illegal activities.

3. The Kingsley employment contract is void and unenforceable because it calls for him to engage in conduct that is itself illegal—namely, managing and operating the Unkechaug gaming facilities once they open.

4. Moreover, all the damages sought for the alleged tortious interference, whether by Carruthers personally or by Springhawk and Summerhawk, are stated to be the amounts that would allegedly have been earned by those plaintiffs "over the life of the gaming contracts" from the various illegal operations that the Unkechaug were supposed to open in partnership with plaintiffs.

Plaintiff argues that all the contracts are perfectly legal, and that defendants have mischaracterized the nature of at least some of those contracts.

*Summary of Conclusions*

The two gaming contracts labeled "Agreement A"—the Casino Gaming Management Agreement between the Unkechaug and Springhawk and the High Stakes Bingo and Gaming Management Agreement between the Unkechaug and Summerhawk—are unquestionably illegal, unenforceable and void. The "B" agreements between the Unkechaug and the two LLCs—otherwise known as the "Economic Development and Management Agreements"—are also illegal, unenforceable and void because the main objective of each of those agreements—the "Project" described by those agreements—is illegal gaming, and the non-gaming development projects contemplated therein are incidental to that illegal purpose. Defendants are thus entitled to dismissal of the Eighth through Fifteenth Causes of Action to the extent those counts allege tortious interference with these gaming contracts or seek an injunction against further interference with those "contracts."

The non-existent "employment agreement" with Kingsley—which, per counsel's most recent letter, is apparently a consulting agreement that was designed to lead to an employment agreement in the future—cannot be interfered with as a matter of New York law, because the "agreement" is not for a definite term. *See, e.g., American Preferred Prescription, Inc. v. Health Management, Inc.,* 252 A.D.2d 414, 417, 678 N.Y.S.2d 1 (1st Dep't 1998). That it is also for an illegal purpose, in that it called for Kingsley to engage in activities relating to illegal gaming, is icing on the cake. To the extent that the Eighth through Fourteenth Causes of Action seek redress from anyone for interfering with Kingsley's "employment contract," they are dismissed with prejudice.

The oral "operating agreement" that formed Springhawk is not valid and enforceable. The complaint specifically alleges that the corporation Springhawk was formed for the purpose of developing and managing illegal gaming operations on the ancestral lands of the Unkechaug. (Cplt.¶ 18.) No other purpose for Springhawk is alleged. The operating agreement was thus formed for an illegal purpose; it can neither be enforced nor interfered with; and the First Cause of Action is dismissed with prejudice to the extent of the Springhawk operating agreement.

Nothing whatever is alleged about the unwritten Summerhawk operating agreement. Its purpose and terms are nowhere described in the complaint. Moreover, none of the factual allegations in the complaint concerns the activities of Summerhawk or that operating agreement. I must, therefore, dismiss any claim relating to the tortious interference with the Summerhawk operating agreement for failure to state any claim on which relief can be granted. Ordinarily that dismissal would be without prejudice. However, as the damages Carruthers seeks to recover for the alleged interference with the Summerhawk operating agreement are predicated on the carrying out of the activities described in the Summerhawk gaming agreements, they cannot be recovered. Thus, dismissal is with prejudice.

The Second through Seventh Causes of Action, which are brought by Carruthers personally, must be dismissed as well. Although they purport to be claims for tortious interference with contract, they do not identify any contract to which Carruthers himself was a party that was subject to interference by any of the defendants. Carruthers, through his lawyer, has stated that the operating agreements are not the subject of the Second through Seventh

Causes of Action, and they are the only contracts to which Carruthers personally is a party.

Additionally, all fifteen tortious interference claims must be dismissed—whether or not the underlying agreements are enforceable—because the damages sought by plaintiffs cannot be recovered, since they are (1) predicated on the operation of illegal gaming activity; and (2) utterly speculative. *See Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 345 F.Supp.2d 360, 368 (S.D.N.Y.2004).

Last, as the gaming agreements are manifestly illegal, plaintiff's prayer for declaratory relief that they are valid and enforceable (Sixteenth Cause of Action) must also be dismissed.

## A. The Eighth Through Fifteenth Causes of Action Must be Dismissed

■ The Eighth through Fifteenth Causes of Action seek relief for tortious interference with the gaming and employment agreements. These claims must be dismissed because it is not possible to interfere, tortiously or otherwise, with any of those contracts.

### 1. The Gaming Agreements

#### The "A" Agreements

Each plaintiff LLC entered into an agreement with the Unkechaug concerning the management of gaming operations — Springhawk in the Catskills and Summerhawk on Long Island. These contracts, which have been provided to the court by plaintiffs' counsel, deal solely with the operation and management of gaming facilities. Because the contemplated facilities cannot be opened legally in New York State, the "A" agreements are necessarily void.

Pursuant to Article 1, Section 9 of the Constitution of the State of New York, no

bookmaking or any other kind of gambling is authorized or allowed within this state, and the legislature is empowered to pass appropriate laws to prevent offenses against the provisions of this section. Armed with this authority, the Legislature has enacted Section 991 of the Penal Law, which reads: "All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

The "A" agreements anticipate the development of casino gambling on Unkechaug land in Sullivan County (Springhawk), and high stakes bingo and other gaming on Long Island (Summerhawk). This activity is patently unlawful under New York's Constitution.

There are limited exceptions to the general prohibition on gaming under New York State law. Two articles of the General Municipal Law—Art. 9–A (games of chance licensing law) and Art. 14–H (bingo licensing law)—permit "authorized organizations" to engage in certain types of otherwise illegal gaming. Under both of these laws, "exempt organizations" are defined as any:

> bona fide religious or charitable organization or bona fide educational, fraternal or service organization or bona fide veterans or volunteer firemen ... provided that each shall operate without profit to its members, and provided that each such organization has engaged in serving one of the lawful purposes as defined in this article for a period of three years immediately prior to applying for a license.

Art. 9–A, § 186(4); Art. 14–H, § 476(4). The "lawful purposes" identified in both laws are limited to: "[benefitting] needy or deserving persons indefinite in number by enhancing their opportunity for religious or educational advancement, by relieving

them of disease, suffering or distress, or by contributing to their physical well being" (§ 186(5)(a)), "initiate, perform or foster worthy public works or ... further the erection or maintenance of public structures" (§ 186(5)(b)), "those who lessen the burdens borne by government or ... voluntarily ... augment or supplement services which government would normally render to the people" (§ 186(5)(c)), "initiate perform or foster the provision of services to veterans" (§ 186(5)(d)). The limited types of gaming authorized by these statutes include bingo and games of chance other than bingo or lotto. *See e.g, Dalton v. Pataki,* 11 A.D.3d 62, 82, 780 N.Y.S.2d 47 (3rd Dep't 2004); *Harris v. Economic Opportunity Com'n of Nassau County, Inc.,* 142 Misc.2d 980, 981, 542 N.Y.S.2d 913 (2d Dep't 1989). Neither casino gambling nor high stakes bingo are authorized by these limited exceptions.

The complaint does not allege that the Unkechaug Nation qualifies as an "exempt organization" under either of these exceptions, or that it holds any license from the New York State Racing and Wagering Board that would allow it to conduct any gaming activity. And that is not the plaintiffs' argument. Rather, they argue that the Tribe is a sovereign nation (albeit not one recognized by the United States government), and so can operate gaming facilities on its "ancestral lands" without interference from either the state or federal government. *See* Pl. Consolidated Answering Brief at 4–5.

Plaintiffs are wrong. Because the Unkechaug are not federally-recognized, the are neither sovereign nor can they claim preemption from state laws forbidding gambling that is extended to federally-recognized tribes by the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701, *et seq.* And lacking both sovereignty and the benefit of IGRA preemp-

**466**

tion, they are subject to New York's strict prohibition against gaming, just like anyone else.

It is well settled that tribes recognized by the United States Government as sovereign nations can avoid state law prohibitions on gaming. In *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), the United States Supreme Court allowed two federally recognized Indian tribes located in California to conduct high-stakes bingo on their reservation, even though such activity violated California law. The tribes' status as federally recognized was critical to the court's reasoning. The federal government had granted the Indian tribe sovereignty with the goal of encouraging tribal self-sufficiency and economic development. *Id.* at 216–17, 107 S.Ct. 1083. The Supreme Court concluded that State regulation would impermissibly infringe on the tribe's self-governance. *Id.* at 221–22, 107 S.Ct. 1083.

In response to *Cabazon,* Congress enacted IGRA. IGRA permits different types of gaming, including casino gambling, on Indian lands—defined as lands within the limits of an Indian reservation or land which is held in trust by the United States for the benefit of an Indian tribe (25 U.S.C. § 2703(4))—under specified conditions. The act classifies gaming activities into three different categories. Tribes have exclusive jurisdiction over Class I gaming, which includes social games and traditional forms of Indian gaming connected to tribal ceremonies. 25 U.S.C. §§ 2703(6), 2719(a)(1). Class II gaming— basically bingo, together with similar games—can be conducted by tribes subject to regulation by the National Indian Gaming Commission ("NIGC"). 25 U.S.C. §§ 2703(7), 2710(b). Pursuant to IGRA, high-stakes bingo and slot machines—the type of gaming contemplated by the "A"

agreement between Summerhawk and the Unkechaug—may only be conducted by a federally recognized Indian tribe on lands that the federal government defines as Indian lands, unless the state otherwise permits such activity. *New York v. Shinnecock Indian Nation,* 280 F.Supp.2d 1, 6 (E.D.N.Y.2003); 25 U.S.C. § 2710(d)(1). All other gaming activity (including both electronic gaming devices and traditional casino games, such as card tables, craps, roulette, and slot machines) qualifies as Class III gaming. 25 U.S.C. § 2703(8). Tribes can undertake Class III gaming on ancestral lands or land acquired by the United States and held in trust for benefit of the tribe only after entering into a "compact" with the host state. 25 U.S.C. § 2710(d)(3). These compacts define which types of Class III gaming activities the Tribes can conduct, and usually provide that a portion of the gaming revenues will go to the State. Any compact between a state and the Tribe must be approved by the Secretary of the Interior. 25 U.S.C. § 2710(d)(3)(B). *See Catskill Development, L.L.C. v. Park Place Entertainment Corp.,* 144 F.Supp.2d 215, 218–19 (S.D.N.Y.2001).

IGRA preempts state anti-gaming laws, but only to the extent of its application. *Cayuga Indian Nation of New York v. Village of Union Springs,* 317 F.Supp.2d 128, 148 (N.D.N.Y.2004); *see also First American Casino Corp. v. Eastern Pequot Nation,* 175 F.Supp.2d 205, 209 (D.Conn. 2000) (citing *State ex rel. Nixon v. Coeur D'Alene Tribe,* 164 F.3d 1102 (8th Cir. 1999)), cert. denied, 527 U.S. 1039, 119 S.Ct. 2400, 144 L.Ed.2d 799 (1999); *Gaming Corp. of America v. Dorsey & Whitney,* 88 F.3d 536 (8th Cir.1996). In particular, IGRA applies only to the activities of federally recognized tribes. *See First Am. Casino,* 175 F.Supp.2d at 208; *Passamaquoddy Tribe v. Maine,* 75 F.3d 784, 792 n. 4 (1st Cir.1996) ("[IGRA] has no applica-

tion to tribes that do not seek and attain formal federal recognition.").

The Unkechaug are not a federally recognized tribe. Therefore, IGRA provides no exception for the Unkechaugs from the general prohibition on gambling in New York State. *See Scutti Enterprises, LLC. v. Park Place Entertainment Corp.*, 322 F.3d 211, 215 (2d Cir.2003).

Plaintiffs contend that, because they do not fall within the ambit of IGRA, the Supreme Court's decision in *Cabazon* permits the tribe to conduct whatever gaming it likes on its ancestral lands. But they are wrong, for two reasons.

First, *Cabazon* itself applies only to gaming activities conducted by federally-recognized Indian tribes on land that the federal government recognizes as reservation land. *Cabazon*, 480 U.S. at 204–05, 107 S.Ct. 1083. In *Cabazon*, the federal government had granted the Indian tribe sovereignty, and, on that basis, the Court concluded that state regulation would impermissibly infringe on their right of self-governance. *Id.* at 221–22, 107 S.Ct. 1083. *Cabazon* by its terms has no applicability to this case, which involves a tribe that is not federally recognized as a sovereign nation, and whose ancestral lands have not been recognized by the federal government. Gaming activities on land that is not federally recognized as tribal lands remains within the State's historic right to regulate this controversial type of economic activities. *See State ex rel. Nixon, supra,* 164 F.3d at 1108–09 (holding that gaming activity by Indians conducted off federally recognized tribal land is subject to regulation by the state); *see also Matter of 1,750 Cases of Liquor,* 166 Misc.2d 739, 745, 633 N.Y.S.2d 702 (Sup.Ct. Oneida County 1995) (holding that because there is no tradition of sovereign immunity that favors the Indians in distributing alcohol, and because the activity may have a sub-stantial impact beyond the reservation, the tribe was subjected to New York State liquor laws) (citing *Rice v. Rehner,* 463 U.S. 713, 724–25, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983)).

Second, Plaintiffs' contention that the Unkechaug enjoy sovereign immunity despite the Tribe's lack of federal recognition is meritless. Whether a tribe is recognized as sovereign is determined by application to the Bureau of Indian Affairs ("BIA"). *See Shinnecock Indian Nation,* 280 F.Supp.2d at 7–8; 25 C.F.R. Part 83. The Unkechaugs have never been recognized by the BIA. Recognition by New York State does not confer sovereignty; a state cannot conduct foreign policy. *Shinnecock, supra,* 280 F.Supp.2d at 7 (holding that issues of sovereignty and immunity are matters of federal law).

Absent federal recognition, the Unkechaug do not enjoy sovereign immunity. The tribe must, therefore, comply with all New York State laws, including the State's prohibition on gambling. *See Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 59–60 (2d Cir.1994) (refusing to grant a state-recognized tribe sovereign immunity absent recognition by the BIA); *see also Shinnecock Indian Nation,* 280 F.Supp.2d at 8–9; *Western Shoshone Bus. Council, Edwards, McCoy & Kennedy, P.C. v. Babbitt,* 1 F.3d 1052, 1056–57 (10th Cir.1993). Since the "A" Agreements call for plaintiffs to manage patently illegal gaming operations on behalf of the Unkechaug, they are void and unenforceable.

*The "B" Agreements*

The "B" agreements are called "economic development and management" agreements. The recitals in each such agreement relate to both gaming operations and "non-gaming enterprises." To the extent that the "B" agreements relate to gaming operations, they are clearly invalid and

unenforceable. To the extent that they call for the development of non-gaming enterprises, they could, in theory, be valid and enforceable—but only as long as that non-gaming development is not incidental to a primary illegal purpose.

■ "Where an agreement consists in part of an unlawful objective and in part of lawful objectives, the court may sever the illegal aspects and enforce the legal ones, so long as the illegal aspects are incidental to the legal aspects and are not the main objective of the agreement." *Donnell v. Stogel,* 161 A.D.2d 93, 97–98, 560 N.Y.S.2d 200 (2d Dep't 1990) (citations omitted). However, where the main objective of an agreement is illegal, courts will not sever and enforce incidental legal clauses. *Id.; see also McCall v. Frampton,* 81 A.D.2d 607, 698–09, 438 N.Y.S.2d 11 (2d Dep't 1981); *Rose v. Elias,* 177 A.D.2d 415, 416, 576 N.Y.S.2d 257 (1st Dep't 1991).

■ That gaming is the main objective behind the "B" agreements—not just some incidental aspect to perfectly legal activity—is easily seen when one reads the preamble to the "B" agreements (which are identical except as to party and Project):

Whereas Nation is a Sovereign Nation with Reservation Lands and ·

Whereas Nation is now the owner of the property located at Unkechaug Indian Nation Reservation surrounded by the State of New York (Reservation), and

Whereas the Nation is desirous of developing and operating full scale (High Stakes Bingo and Gaming Facilities on land to be acquired by the Nation at Schodack, New York/Class II and Class III gaming facilities (Gaming Facilities)), on land to be acquired by the Nation at Long Island, New York [Springhawk and Summerhawk "B"

Agreements, respectively] and to be declared Territory of the Nation, such property is hereinafter sometimes referred to as Property, and

Whereas Nation is desirous of developing the Property to enhance and increase Nation revenues and undertake Nation economic development so as to increase Nation self-sufficiency and Nation self-government, and

Whereas the Nation is seeking financing and financial and technical expertise for such economic development and the operation of developed facilities on the above-referenced Property, and

Whereas Nation is desirous of vesting in SH and hereby assigns the irrevocable and exclusive right to develop and operate, for the Nation by and through various entities to be created by SH and, in accordance with Tribal/State Gaming Compact to be negotiated and entered into with the State of New York if such Compact is appropriate and required by law, the Gaming Facilities on the Property to be acquired by the Nation at Schodack, NY/ Long Island, N.Y. [Springhawk and Summerhawk "B" Agreements, respectively]; and

Whereas SH is desirous of performing the development and management of such gaming facility and non gaming enterprises on the Property, with its affiliates and with third parties to be named by SH . . . .

In the body of each "B" agreement, the Unkechaug purport to give the contraparty LLC (Springhawk or Summerhawk) the exclusive and irrevocable right to develop and manage the relevant gaming facilities (Class II and III Gaming Facilities on Long Island for Summerhawk; High Stakes Bingo and Gaming Facilities (including Class II and Class III gaming) at Schodack for Springhawk), together with other non-gaming facilities and activities

relating to the gaming facilities and "such other economic and development activities as shall be determined and further agreed upon, from time to time, by SH and Nation as these *projects* develop." (Emphasis added). The critical word here is "projects," because the word "project" is a defined term in the "B" Agreements. "Section II" of the agreements is entitled "PROJECT," and it describes what the "project" is for purposes of the Agreement:

> The Nation will operate the Unkechaug Indian Gaming Facility on prime land in [Schodack, New York/ Long Island, New York]. The Casino gaming area will be approximately [60,000/250,000] square feet and contain all gaming as such as those in Las Vegas gaming facilities .... (Springhawk and Summerhawk "B" Agreements, respectively.)

It thus appears from the text of these agreements that all of the economic development contemplated therein—including the various non-gaming facilities and services—are tied to the development of the patently illegal gaming "Project." Because the main object of these agreements is illegal, the law will not sever and enforce any tangential "legal" aspects of the "B" agreements. The "B" agreements are entirely void.

### 2. *The Employment Agreement*

■ The Eighth through Fourteenth Causes of Action also purport to allege tortious interference with Kingsley's employment contract.

It turns out that, complaint notwithstanding, there is no Kingsley employment contract. When asked to produce a copy of the agreement, so its validity could be determined, counsel sent a letter representing that Kingsley had an "open-ended" oral consulting agreement, which was designed to lead to a permanent arrange-

ment in the future, but which was terminable at will by either party. It is not possible to interfere with an agreement for employment or services that is terminable at will. *American Preferred Prescription, Inc. v. Health Management, Inc.*, 252 A.D.2d 414, 417, 678 N.Y.S.2d 1 (1st Dep't 1998) (citing *Guard–Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191–92, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980)) (holding contracts for an indefinite term are terminable at will, by either party, and are therefore classified as only prospective contractual relations, and thus cannot support a claim for tortious interference with existing contracts).

For the above reasons, the Eighth through Fifteenth Causes of Action, which seek damages for the defendants' allegedly tortious interference with the gaming and employment agreements, are dismissed.

### B. The First Cause of Action, for Tortious Interference with the Operating Agreement, Must be Dismissed

■ The First Cause of Action, brought by Carruthers as the sole named plaintiff, relates to the AP Equity Defendants' alleged tortious interference with the operating agreements.

As noted above, the Springhawk agreement was oral rather than written. The only term specifically pleaded in the complaint is the relative ownership share in Springhawk of the three principals of the LLC. However, Carruthers is bound by the allegations of his complaint, and the complaint specifically alleges that Springhawk was formed to develop and operate high-stakes bingo and other gaming facilities in Sullivan County, New York on ancestral land of the Unkechaug Indian Nation (Cplt.¶ 18), and that its members entered into an operating agreement shortly after the LLC was formed for that purpose (Cplt.¶ 21). Since Sprin-

ghawk's stated corporate purpose was illegal, any agreement formed to operate Springhawk is unenforceable. Therefore, the First Cause of Action is dismissed with prejudice insofar as it relates to the Springhawk agreement.

No such allegation of illicit purpose is asserted as to Summerhawk. In fact, nothing of any substance is alleged about Summerhawk—including how anyone allegedly interfered with the Summerhawk operating agreement. The First Cause of Action is dismissed insofar as it relates to Summerhawk for failure to state any claim on which relief can be granted.

 Ordinarily, this claim would be dismissed without prejudice. However, it must be dismissed with prejudice, because Carruthers cannot recover the damages he seeks—for two reasons. First, they are predicated on the completion of illegal activity—the bringing to fruition of the gaming contracts—and are not recoverable for that reason alone. *Harris, supra,* 171 A.D.2d at 229, 575 N.Y.S.2d 672 (citing *Stone v. Freeman,* 298 N.Y. 268, 82 N.E.2d 571 (1948)). Second, these "lost profits" damages are far too speculative predicated as they are on the coming to fruition of a project that is (1) presently illegal; and (2) uncertain of accomplishment; and (3) predictive of a wholly new business enterprise, with no track record of accomplishment.

Under New York law, lost profits are recoverable as an element of damages only where they result as the natural and probable consequence of a tortious act. *See, e.g., 342 Holding Corp. v. Carlyle Construction Corp.,* 31 A.D.2d 605, 295 N.Y.S.2d 248, 249 (1st Dep't 1968); *Hughes v. Nationwide Mut. Ins. Co.,* 98 Misc.2d 667, 414 N.Y.S.2d 493 (Sup.Ct. Livingston County 1979). This means that lost profits may be recovered only if plaintiffs prove them with reasonable certainty and without speculation. *See Steitz v. Gifford,* 280 N.Y. 15, 20, 19 N.E.2d 661 (1939); *Dunlop Tire & Rubber Corp. v. FMC Corp.,* 53 A.D.2d 150, 154–155, 385 N.Y.S.2d 971 (4th Dep't 1976); *Paduano v. State,* 203 A.D. 503, 505, 196 N.Y.S. 804 (4th Dep't 1922); *Veverka v. Spinella,* 60 Misc.2d 529, 303 N.Y.S.2d 305 (Sup.Ct. Green County 1969).

The lost profits sought by Carruthers for tortious interference with the Summerhawk operating agreement (or the Springhawk agreement, for that matter) are based on profits they expected to receive as a result of the LLC's gaming contracts with the Unkechaug. In order for those contracts to be legally enforceable, and the contemplated gaming projects to come to fruition, a number of hurdles would have to be surmounted, including but hardly limited to obtaining: (1) federal recognition, (2) National Indian Gaming Commission approval, and (3) a state gaming compact. It appears that none of these is even in the works, since plaintiffs were relying on the Unkechaugs' non-existent sovereignty to get them around both state and federal regulation. This ruling eliminates those hopes. Plaintiffs cannot even estimate how long it would take them to accomplish the results they had hoped to achieve without government interference, and they cannot predict that they will be able to obtain the approvals they require. Therefore, they cannot establish that the claimed damages were the result of the alleged interference with the operating agreements. (*see, e.g., Steitz, supra,* 280 N.Y. at 20, 19 N.E.2d 661). As damage is an element of tortious interference with contract, the First Cause of Action must be dismissed with prejudice, even insofar as it relates to the factually vague allegations of interference with the Summer-

hawk operating agreement.[6]

### C. The Second Through Seventh Causes of Action Must Be Dismissed

██ Like the First Cause of Action, the Second through Seventh Causes of Action are brought by Carruthers, not by Springhawk or Summerhawk. They, too, allege tortious interference. The question is—tortious interference with what?

Causes of Action Two through Seven do not specify what contracts the various defendants allegedly interfered with. I originally thought that plaintiff was trying—inartfully—to allege that the Flaum Defendants, the Gallant Defendants and the Galbut Defendants, acting through the AP Equity Defendants, had somehow induced Simermeyer and Stanley to breach their duty to Carruthers under the Springhawk and Summerhawk operating agreements. That made some sense, since Carruthers was the only party plaintiff in the Second through Seventh Causes of Action, and the only contracts alleged in the complaint to which he personally was party were the operating agreements.

However, in plaintiffs' Memorandum of Law, Carruthers asserts that the First Cause of Action is "unrelated to the next 15 causes of action." (Pl. Consolidated Answering Brief at 12–13.) I accept Carruthers' clarification of his pleading, and I therefore conclude—contrary to my initial belief—that Claims Two through Seven have nothing to do with any alleged tortious interference with the operating agreements. Otherwise, they would be "related" to the First Cause of Action.

What this means is that the Second through Seventh Causes of Action must be dismissed. To plead tortious interference with contract, a plaintiff must first and foremost plead that one is a party to a valid contract with which someone interfered. The only contracts that Carruthers can claim tortious interference with are the two oral operating agreements among him, Simermeyer and Stanley. The complaint does not allege that Carruthers is a party to the gaming agreements or to Kingsley's employment contract, and after reviewing the gaming agreements (both "A" and "B") and counsel's description of Kingsley's oral consulting agreement, it is apparent that no such allegation could be made. Since Carruthers eschews any suggestion that the Second through Seventh Causes of Action relate to the alleged interference with the only agreements to which he is party, he fails to allege the existence of any agreements with which anyone could have tortiously interfered, and the Second through Seventh Causes of Action must be dismissed for failure to state a claim on which relief can be granted.[7]

### D. The Sixteenth Cause of Action, for Declaratory Judgment, Must Be Dismissed As Well

Finally, in the Sixteenth Cause of Action, plaintiffs seek a declaration that the gaming agreements are valid and enforceable contracts. Since they manifestly are not, this claim must be dismissed.

### II. The Separate Motion by the Flaum Defendants for Judgment on the Pleadings

### A. The Eighteenth Cause of Action (Breach of Contract)

██ The Eighteenth cause of action is by Springhawk against all the defendants.

---

6. Every other claim for tortious interference could be dismissed on the same theory.

7. If they were not dismissed on that ground, they would be dismissed for the same reason, and to the same extent, as the First Cause of Action.

It asserts that the Flaum, Galbut and Gallant Defendants, acting through the AP Equity Defendants, breached the contract between Ancestral and Springhawk for the transfer of the Apollo Mall Plaza by failing to settle the outstanding mortgage claim and/or to pay the balance of the mortgage. (Cplt.¶¶ 203, 208–09.) Springhawk also alleges that Ancestral breached its contract with Springhawk by failing to deliver title to the 3D Industrial Park. (Cplt.¶ 204.) Finally, Springhawk alleges that AP Equity breached its implied and/or express contract with Springhawk to deliver clear and marketable title to the Apollo Mall Plaza. (Cplt.¶¶ 205, 206.) The complaint alleges that the actions of the AP Equity defendants occurred within the scope of their employment and agency for the Flaum, Gallant and Galbut Defendants. (Cplt. ¶ 210.)

The Flaum Defendants move to dismiss the Eighteenth cause of action as against them.

The essential elements of an action for breach of contract under New York law are (1) formation of a contract between the parties, (2) plaintiff's performance, (3) defendant's failure to perform, and (4) resulting damages to plaintiff. *Guity v. Martinez,* 03 Civ. 6266(LAP), 2004 WL 1145832, at *5 (S.D.N.Y.2004) (*citing Startech, Inc. v. VSA Arts,* 126 F.Supp.2d 234, 236 (S.D.N.Y.2000)). It is also "well established that a plaintiff in a breach of contract action 'may not assert a cause of action to recover damages for breach of contract against a party with who it is not in privity.'" *Yucyco, Ltd. v. Republic of Slovenia,* 984 F.Supp. 209, 215 (S.D.N.Y. 1997) (quoting *Perma Pave Contracting*

*Corp. v. Paerdegat Boat & Racquet Club, Inc.,* 156 A.D.2d 550, 551, 549 N.Y.S.2d 57, 58 (2d Dep't 1989)).

The Complaint does not identify or allege the existence of any contracts between the Flaum Defendants and Springhawk. However, springhawk alleges that AP Equity and Ancestral acted as agents of the Flaum defendants, and that the alleged principal-agency relationship establishes the requisite privity for this cause of action to survive the motion to dismiss. *See Huntington Pennysaver, Inc. v. Tire Supply Corp. of Long Island,* 59 Misc.2d 268, 269, 298 N.Y.S.2d 824 (Dist. Ct. Suffolk County 1969) (holding principal liable for the authorized contracts made by his agents with a third party) (citing Restatement, 2d, Agency, § 146). The same is true if the principal was undisclosed. *See Industrial Mfrs., Inc. v. Bangor Mills, Inc.,* 283 A.D. 113, 121, 126 N.Y.S.2d 508 (1st Dept.1953) ("plaintiff [ ]has the right to hold the principal liable when finally disclosed") (citing Restatement, 2d, Agency, § 186). Because on a motion for judgment on the pleadings I must accept the allegations of the complaint as true and draw all inferences in Springhawk's favor (*see Desiderio, supra,* 191 F.3d at 202), I must deny the motion to dismiss this claim.

### B. The Twenty First Cause of Action (Fraud and Misrepresentation):

 In the Twenty First cause of action Springhawk alleges fraud and misrepresentation by the Flaum Defendants, Gallant, Galbut and 3D Associates for the actions taken by their agents—AP Equity, Ancestral, Petri, Young and Barbanti.[8]

---

8. The twentieth and twenty-second causes of action are directly against AP Equity, Ancestral, Petri, Young and Barbanti for fraud and misrepresentation concerning the ownership and control of the Apollo Plaza, 3D Industrial

Park, and other properties that they allegedly caused plaintiffs to rely upon in purchasing such properties (Cplt.¶¶ 217–18), and for all acts taken in furtherance of the agency-principle relationship with the Flaum defendants,

Springhawk claims that the AP Equity Defendants knowingly made false made representations of fact to it regarding the ownership and control of the Apollo Plaza Mall, 3D Industrial Park, and other properties, and the status of liens and mortgages against these properties. (Cplt.¶ 217.) Springhawk also alleges that the defendants intended for it to rely on these representations in deciding to purchase properties and enter into real estate development contracts. (Cplt.¶ 218.) Springhawk claims that as a result of these misrepresentations, it incurred losses primarily for the "delay and possible cancellation in opening the gaming facilities." (Cplt.¶ 221.) Springhawk also claims damages which are not gaming related, such as the loss of a $550,000 purchase deposit for the properties. (*Id.*)

Construing the allegations of the complaint most favorably to Springhawk, this claim alleges that, based on certain misrepresentations, Springhawk put down money toward the purchase of a piece of property; the purchase went awry; and its money was used by another party to buy the property for the benefit of a third party. There is no allegation in the complaint that misrepresentations were made concerning gaming opportunities—rather, the complaint alleges that misrepresentations were made concerning the true ownership of the property and the status of the mortgage. In a complaint where little else makes sense, this makes sense. Whether it is true or not is another matter entirely—and is, at this point in the litigation, irrelevant.

To the extent that the Flaum Defendants' motion is predicated on the fact that Springhawk and the Unkechaug intended to use the properties they purchased for gaming—a purpose that could not be realized—is of no moment, except possibly as

to the measure of Springhawk's damages. While the millions upon millions of dollars in damages sought by plaintiff are, for the reasons stated above, not recoverable, it is conceivable that Springhawk could recover some damages resulting from the busted land deal. It allegedly put a substantial sum of money—$550,000—toward the purchase of a property that is now owned by someone else. Its down payment was allegedly used by another party to purchase the land. Whether the Flaum Defendants had anything whatever to do with that will be sorted out in discovery.

The Flaum Defendants also move to dismiss this claim for failure to plead fraud with particularity. I deny this motion as well. Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff asserting a fraud claim to do so with particularity. *See* Fed.R.Civ.P. 9(b). Under prevailing standards in this Circuit, when a complaint charges fraud, "It must (1) detail the statements ... that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements ... were made, and (4) explain why the statements ... are fraudulent." *Olsen v. Pratt & Whitney Aircraft,* 136 F.3d 273, 275 (2d Cir.1998) (quoting *Harsco Corp. v. Segui,* 91 F.3d 337, 347 (2d Cir.1996)). The Complaint must also allege facts that give rise to a strong inference of fraudulent intent. It can do so by (1) alleging facts to show that the defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.,* 84 F.3d 629, 634 (2d Cir.1996). "The primary purpose of Rule 9(b) is to afford the defendant fair notice of the plaintiff's

Gallant, Galbut and 3D Associates.

(Cplt.¶ 228.)

claim and the factual ground upon which it is based." *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990).

Insofar as the misrepresentations are alleged against the AP Equity Defendants, they are alleged with sufficient particularity. The Flaum Defendants are not alleged to have made any misrepresentations. However, the complaint alleges that the AP Equity Defendants made the particularized fraudulent allegations on behalf of the Flaum Defendants, making them liable therefor. Since the complaint satisfies Rule 9(b) with regard to the AP Equity Defendants, I decline to dismiss this claim against the Flaum Defendants.

This is no endorsement of the ultimate viability of Springhawk's claim. I have elsewhere referred to the complaint as a fishing expedition. The following statement in plaintiffs' Consolidated Answering Brief—"Completion of discovery may well result in the voluntary dismissal of the fraud claim as against one or more defendants" (Pl. Consolidated Answering Brief at 17)—does not inspire great confidence that Springhawk knows what it is talking about. Plaintiffs began this action in the State Supreme Court, but they are now in Federal Court and they are not going anywhere. They and their lawyer leave themselves open to the imposition of serious sanctions if it turns out that these allegations of agency are pie in the sky.

However, at least one of the alleged misrepresentations—that the mortgage on the Apollo Mall would be settled for a lesser amount—is not actionable for a different reason. The complaint does not allege that this statement was untrue at the time it was made. In the absence of such an allegation, all that is alleged is a promise to do something in the future, which will not support a claim of fraud. *Weinstein v. Appelbaum*, 193 F.Supp.2d 774, 778–79 (S.D.N.Y.2002) (citing *Cham-pion Titanium Horseshoe, Inc. v. Wyman–Gordon Inv. Castings, Inc.*, 925 F.Supp. 188, 190 (S.D.N.Y.1996)).

## C. Twenty–Fifth Cause of Action (Piercing the Corporate Veil)

■ The twenty-fifth cause of action asks the court to pierce the corporate veil of Ancestral and AP Equity and to conclude that Gallant, Flaum, Flaum Management, Galbut, 3D Associates, Petri, Young and Barbanti are liable for the sins of those corporations. Flaum and Flaum Management have moved for judgment on the pleadings to dismiss this cause of action.

New York law does not recognize a separate cause of action to pierce the corporate veil. *See e.g., Fiber Consultants v. Fiber Optek Interconnect Corp.*, 15 A.D.3d 528, 792 N.Y.S.2d 89 (2d Dep't 2005) (citing *Matter of Morris v. New York State Dept. of Taxation and Fin.*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993)); *H & R Project Associates, Inc. v. City of Syracuse, et al.*, 289 A.D.2d 967, 968, 737 N.Y.S.2d 712 (4th Dep't 2001); *9 East 38th Street Associates, L.P. v. George Feher Associates, Inc.*, 226 A.D.2d 167, 168, 640 N.Y.S.2d 520 (1st Dep't 1996). For that reason alone, the Twenty–Fifth Cause of Action must be dismissed. Moreover, it must be dismissed as against all the defendants, not just the Flaum Defendants.

## III. *The Separate Motion by the Gallant Defendants for Summary Judgment*

In addition to naming Gallant as a defendant in several of the tortious interference claims, Gallant is named individually as a defendant in five other causes of action and along with the other Gallant Defendants in one other. The Gallant Defendants have moved for summary judg-

ment to dismiss each of these claims. Most of the claims against Gallant as an individual are premised on the plaintiffs' assertion that the AP Equity Defendants were authorized to act on Gallant's behalf. (Cplt.¶¶ 100, 102–03.) Plaintiff alleges that "[a]ll of the actions taken by and representations made by [the AP Equity Defendants] occurred with the express authority, apparent authority or subsequent ratification of Gallant" and "within the scope of their employment and agency for Gallant." (Cplt.¶ 110–11.)

### A. The Eighteenth (Breach of Contract) & Twenty–First (Fraud and misrepresentation) Causes of Action

 The Eighteenth and Twenty–First Causes of Action against Gallant are identical to the same claims as asserted against the Flaum Defendants. For the same reason that I could not grant the Flaum Defendants' motion for judgment on the pleadings dismissing these claims, I cannot grant the Gallant Defendants' premature motion for summary judgment.

The Gallant Defendants deny that an agency relationship existed between the AP Equity Defendants and Gallant. *See* Gallant Defendants' Memorandum of Law in Support of Summary Judgment at 8. Plaintiffs' counsel invokes Fed.R.Civ.P. 56(f) to seek an adjournment of this motion. (Letter of March 16, 2005.) Counsel represents that, that if additional facts could not be uncovered, plaintiffs will voluntarily dismiss the claims against the Gallant defendants. *Id.*

I will deny the motion without prejudice, pending discovery, as contemplated by Rule 56(f). However, Springhawk and its lawyer are on notice: the rationale for suing the Gallant Defendants that is described in counsel's Rule 56(f) response strikes me as thin. In the event that discovery fails to yield any evidence of the alleged agency relationship, I will be open to a motion from the Gallant Defendants for sanctions against Springhawk and counsel, in an amount sufficient to cover the full cost to them of the discovery sought by plaintiff.

### B. Twenty–Sixth Cause of Action (Constructive Trust)

In the Twenty–Sixth cause of action, Springhawk sues 3D Associates and Gallant, seeking imposition of a constructive trust against the Apollo Mall Plaza and 3D Industrial Park in favor of Springhawk to the extent of $550,000. (Cplt.¶ 283.)

 It is well settled that in order to set forth a valid cause of action to impose a constructive trust, the following four elements must be alleged: "(1) a confidential or fiduciary relationship, (2) a promise, express or implied, (3) a transfer in reliance thereon, and (4) unjust enrichment." *See e.g., In re Urdang,* 304 A.D.2d 586, 586, 758 N.Y.S.2d 125 (2d Dep't 2003); *see also Sharp v. Kosmalski,* 40 N.Y.2d 119, 121, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976); *Cilibrasi v. Gagliardotto,* 297 A.D.2d 778, 779, 747 N.Y.S.2d 801 (2d Dep't 2002); *Gottlieb v. Gottlieb,* 166 A.D.2d 413, 414, 560 N.Y.S.2d 477 (2d Dep't 1990).

 Plaintiffs allege that Springhawk, Ancestral, and the Unkechaug Indian Nation shared a confidential relationship based on agreements amongst the parties and the nature of their joint ventures. (Cplt.¶ 276.) But the only agreement between Springhawk and Ancestral that is relevant to the Twenty Sixth Cause of Action is the contract pursuant to which Ancestral agreed to transfer the 3D Industrial Park and Apollo Mall Plaza to the Unkechaug, and to settle all of the outstanding mortgages and liens against the Apollo Mall Plaza. (Cplt.¶ 277.) Plaintiffs

**476**

further allege that the $550,000 purchase deposit made to Ancestral—made in reliance on the promise that both properties would be transferred to the Unkechaug—constituted payment to Gallant and 3D Associates, for whom Ancestral was allegedly acting as an agent. (Cplt.¶¶ 278–79.)

Aside from the fact that Springhawk was not intended to be the purchaser of the land that was eventually transferred to 3D Associates and Gallant, the viability of this claim depends on two "reaches." First, it depends on finding an agency relationship between the defendants and Ancestral (or the AP Equity Defendants). I have already ruled that plaintiff can take discovery on this allegation. I remind plaintiff and counsel of the warning I have already issued.

Second, an arm's length contractual relationship between parties does not give rise to a fiduciary relationship. *See e.g., Cuomo v. Mahopac Nat. Bank,* 5 A.D.3d 621, 622, 774 N.Y.S.2d 779, 2004 N.Y. Slip Op. 02154 (2d Dep't 2004) (citing *River Glen Assoc. v. Merrill Lynch Credit Corp.,* 295 A.D.2d 274, 743 N.Y.S.2d 870 (1st Dep't 2002); *WIT Holding Corp. v. Klein,* 282 A.D.2d 527, 724 N.Y.S.2d 66 (2d Dep't 2001); *Wiener v. Lazard Freres & Co.,* 241 A.D.2d 114, 672 N.Y.S.2d 8 (1st Dep't 1998)). It does not appear, from the allegations of the complaint, that the contract among Springhawk, Ancestral, and the Unchechaugs created any sort of fiduciary relationship amongst the parties to that agreement. Even viewing those allegations in a manner favorable to Springhawk, it is difficult to see where the fiduciary aspect of the relationship might be. Springhawk does insert the words "joint venture" into the complaint (Cplt.¶ 276), which I take to be an effort to make this real estate deal look less like a commercial contract and more like a fiduciary relationship. I decline to award summary judg-

ment to the Gallant Defendants on this claim at this juncture, subject to the same caveat as above.

## C. Twenty–Seventh Cause of Action (Unjust Enrichment; Resulting Trust)

In the Twenty–Seventh Cause of Action, Springhawk sues the Gallant Defendants for either the imposition of a resulting trust against the Apollo Mall Plaza to the extent of $300,000 or the value of any actual tax lien payments or, in the alternative, a money award of $300,000 against the Gallant Defendants for unjust enrichment. (Cplt.¶¶ 293, 294.)

The essence of this cause is plaintiffs' allegation that AP Equity and Ancestral took $300,000 of the money it received from Springhawk and applied it towards payment of the tax liens on the Apollo Mall Plaza. (Cplt.¶ 285.) Springhawk believed that the money would be applied to tax liens (as it was), but assumed that it would obtain the third party benefit of such payment when the property was transferred to the Unkechaugs. (Cplt.¶ 288.) However, Springhawk alleges that when the Gallant defendants purchased the Apollo Mall Plaza at the foreclosure sale, the Gallant Defendants' received unencumbered title to the property. (Cplt.¶ 290.) Springhawk alleges that the Gallant Defendants' equitable interest in the property has been increased by the tax lien payment by Springhawk, and that the conditions under which Springhawk paid that expense render the retention of the benefit unjust. (Cplt.¶¶ 290–91.)

A resulting trust arises "where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or

the beneficial interest is otherwise effectively disposed of." Restatement (Second) of Trusts § 404 (1957). There is no way that one could conclude that Springhawk should have a beneficial interest in the Apollo Mall, which is the "property" that was taken or held by Gallant. The Mall was supposed to be transferred to the Unkechaug, not to Springhawk. Springhawk's "beneficial interest" in the property was not an ownership interest, but was limited to its interest in running an illegal gaming operating on behalf of the Unkechaug.

Alternatively, in order to be entitled to recover damages for unjust enrichment, a plaintiff must show that the defendant obtained a benefit that in equity and good conscience he should not have obtained or possessed because it rightfully belongs to another. *iWon, Inc. v. Ourhouse, Inc.,* 192 Misc.2d 1, 5, 744 N.Y.S.2d 791 (Sup.Ct. Westchester County 2001) (citing *Bugarsky v. Marcantonio,* 254 A.D.2d 384, 384, 678 N.Y.S.2d 737 (2d Dep't 1998)). Assuming the allegations of the complaint to be true, someone—and Springhawk alleges that it was Gallant—was enriched to the tune of $300,000, which Springhawk agreed to let the AP Equity Defendants apply toward the mortgage on the Apollo Mall in the expectation that it would be transferred to the Unkechaug. I decline to grant the motion for summary judgment dismissing Springhawk's claim for unjust enrichment, but I do so without prejudice, pending discovery. The same warning applies.

## Conclusion

For the reasons stated above, the first Sixteen Causes of Action and the Twenty-Fifth Cause of Action are dismissed with prejudice as to all defendants. The Flaum defendants' motion to dismiss on the pleadings the Eighteenth and Twenty-First Causes of Action is denied. The Gallant defendants' motion for summary judgment as to the Eighteenth, Twenty–First, Twenty–Sixth, and Twenty–Seventh Causes of action is denied without prejudice to renewal following discovery.

A Case Management Order is attached. Counsel will note that it calls for all discovery to be concluded within 120 days. I will not extend that deadline for any reason.

This constitutes the decision and order of the Court.